**Garry Z. LUKER, Sr. and Granbury Properties, Inc., Appellants,**

v.

**Jerry ARNOLD, et ux Carlye Arnold, Appellees.**

No. 2–90–089–CV.

Court of Appeals of Texas, Fort Worth.

Oct. 14, 1992.

Rehearing Denied Nov. 24, 1992.

---

Walton, Brown, Walton, Seilheimer & Reid, P.C., Edwin J. Seilheimer, Granbury, for appellants.

Hill, Heard, Gilstrap, Goetz & Moorhead, Frank Gilstrap, Arlington, for appellees.

Before WEAVER, C.J., and MEYERS and DAY, JJ.

## OPINION

MEYERS, Justice.

This is an appeal by Granbury Properties and its president, Garry Z. Luker, Sr., defendants below. A jury found damages in favor of appellees, Jerry and Carlye Arnold, for negligent representation, failure to enforce deed restrictions, and for violations of the Texas Deceptive Trade Practices Act. Appellants are seeking relief from the judgment awarding $59,020.00. In addition, appellants were ordered to pay prejudgment interest and $15,000.00 in attorney's fees.

We affirm the judgment.

In ten points of error, appellants contend the trial court erred in failing to grant their motion for judgment as to the DTPA violations because 1) the appellees are not consumers as to the appellants; 2) and 3) there are no implied or express warranties owed by the developer to develop in a good and workmanlike manner; 4) there was no evidence to support the jury's answer that appellants failed to develop and replat the subdivision in a good and workmanlike manner; and 5) there was no evidence to support the jury's answer that the appellants represented that the septic systems would meet state requirements when, in fact, they did not.

Appellants also contend that: 6) there is no evidence to support the finding of negligent misrepresentation; 7) there is no duty owed by appellants to enforce deed restrictions; and 8) the trial court erred in refusing to credit the amounts paid by the settling co-defendants and refusing to reform the judgment to credit such amounts. Finally, appellants assert that 9) appellees did not have a valid assignment of the Conns' claims and 10) the Conns' assigned claims were barred by the statute of limitations.

In this case, the appellees, along with Robert and Sherilyn Conn, bought five du-

plexes in the Meadowlark Oaks Addition from John and Janice Billingsley. The Billingsleys had acquired the property from the appellants in a separate transaction. The appellees and the Conns sued both the appellants and the Billingsleys for misrepresentation, negligence, and DTPA violations regarding the property. The Conns assigned their cause of action to appellees. The appellees' claims against the Billingsleys were settled for damages and dismissed with prejudice.

## I. CONSUMER STATUS OF APPELLEES

■ Appellants' first point of error is that the appellees are not consumers under the DTPA. Appellees have the burden of proving their consumer status. *Precision Sheet Metal Mfg. v. Yates*, 794 S.W.2d 545, 551 (Tex.App.—Dallas 1990, writ denied). Whether or not a party is a consumer is typically a question of law for the trial court, unless some elements are in dispute. *See Security Bank v. Dalton*, 803 S.W.2d 443, 451 (Tex.App.—Fort Worth 1991, writ denied); *Tuscarora Corp. v. HJS Indus.*, 794 S.W.2d 435, 441 (Tex.App.—Corpus Christi 1990, writ denied).

■ The definition of consumer is one "who seeks or acquires by purchase or lease, any goods or services." TEX.BUS. & COM.CODE ANN. § 17.45 (Vernon 1987). This definition is further clarified by the supreme court in *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535 (Tex.1981). *Cameron* provides two elements to the definition of consumer: 1) the party must have sought or acquired goods or services by purchase or lease; and 2) the goods or services purchased or leased must form the basis of the complaint. *Id.* at 539; *see Herndon v. First Nat'l Bank*, 802 S.W.2d 396, 399 (Tex.App.—Amarillo 1991, writ denied) (opinion on reh'g) (using *Cameron* to define "consumer").

These elements are not in question in this case. Thus, ordinarily the question of whether the appellees are consumers would be a question of law for the trial judge. However, in the instant case, the jury charge contained a special question not encompassed by the *Cameron* elements. Special Question # 18 reads:

> **Do you find that Granbury Properties, Inc. and/or Garry Luker, Sr. sought to enjoy a benefit of the transaction in question?** [Emphasis added.]

The jury answered "we do not" as to both appellants. Appellees made a motion to disregard the jury's answer to Special Question # 18 which was denied. However, their motion for judgment was granted. Therefore, the trial judge either disregarded the answer as immaterial or determined, sua sponte, that appellees proved this element as a matter of law. TEX.R.CIV.P. 301; *U.S. Fire Ins. Co. v. Pettyjohn*, 816 S.W.2d 839 (Tex.App.—Fort Worth 1991, no writ) (these are the only two instances when a jury's answer to a special question may be disregarded).

### A. Is Special Question # 18 material?

■ Appellants' argument is that this question is material to the definition of consumer. If the question is material, appellants argue that because of the jury's negative answer appellees failed to prove their consumer status *as to appellants*.

Appellants rely on *Knight v. International Harvester Credit Corp.*, 627 S.W.2d 382 (Tex.1982) for the language in Special Question # 18. As in this case, *Knight* involved three parties: a plaintiff and two defendants. *Id.* at 383. The plaintiff received a purchase money loan from one defendant and used it to buy a truck from the other defendant in a single transaction. *Id.* at 389. The lender/defendant argued that the plaintiff was not a consumer as to it but the supreme court found to the contrary. *Id.* The court considered the realities of the transaction and held that the two defendants were inextricably intertwined and that "Knight was a 'consumer' as to all parties who sought to enjoy the benefits of that sale." *Id.* This is because the lender/defendant supplied all the financing for the seller/defendant's customers; its name appeared on the seller/defendant's sales contract with Knight; it had drafted and supplied Knight's sales contract and most of the seller/defendant's

contracts; and a preprinted clause assigning the contract to the lender/defendant was contained in the sales contract. *Id.*

Appellants argue that because of *Knight's* treatment of the definition of consumer, it is material in this case whether or not the appellants were so inextricably intertwined with the Billingsleys that they sought to enjoy the benefit of the transaction between the appellees and the Billingsleys. Another case like *Knight* is *Flenniken v. Longview Bank & Trust Co.*, 661 S.W.2d 705 (Tex.1983). It also involved one plaintiff claiming consumer status as to two defendants. *Id.* at 706. The Flennikens had acquired the services of one defendant to build them a house. *Id.* This builder/defendant then assigned his interest in payment to a lender/defendant for financing. *Id.* The court held that there was only one transaction because the Flennikens were involved solely for the purchase of a house and the assignment was a means of enabling the builder/defendant to build the house and eventually make the sale. *Id.* at 707. Because of this the Flennikens "were consumers as to all parties who sought to enjoy the benefits of that transaction, including the Bank." *Id.*

■ The supreme court confirmed that whether defendants are inextricably intertwined with *each other* in a DTPA transaction is relevant for the purpose of establishing whether the plaintiff is a consumer to all those defendants. *Qantel Business Sys. v. Custom Controls*, 761 S.W.2d 302, 305 (Tex.1988). Thus, a plaintiff can be a consumer to one defendant but not a consumer to another defendant, depending on the *defendants' relationship with each other.* The language in *Knight* "was made in the context of establishing whether the plaintiff was a consumer with respect to the financing company as well as the seller of the truck involved in the action." *Id.* The supreme court in *Knight, Flenniken* and *Qantel* interpreted and applied the language in Special Question # 18 as material to consumer status. *See Holland Mortg. & Inv. Corp. v. Bone*, 751 S.W.2d 515, 517–18 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.) (finding a "tie-in" relation-

ship between the builder and lender); *Briercroft Serv. Corp. v. De Los Santos*, 776 S.W.2d 198, 206 (Tex.App.—San Antonio 1988, writ denied) (opinion on reh'g) (holding that whether the defendants were "inextricably intertwined" is a question of fact). The language is material.

### B. When is Special Question # 18 material?

The supreme court has not specifically held when such a question is material. Appellees' second argument is that if the question is material, it is so only when the second *Cameron* element fails because the goods purchased are not the basis of the complaint. If this is true then the special question is immaterial in this case and was correctly disregarded. Here, the second *Cameron* element was met since the goods form the basis of the complaint. The goods that form the basis of appellees' DTPA claim are the duplexes' defective septic systems.

There is a basis for appellees' second argument in *Briercroft*, 776 S.W.2d 198. In *Briercroft*, the plaintiffs contracted with the builder/defendant to make improvements on their home. *Id.* at 206. They financed this through the lender/defendant. *Id.* The plaintiffs could not prove their consumer status as to the lender/defendants because they sought only to borrow money and the lending of money invokes neither a good nor a service. *Id.* Despite their failure to satisfy the second *Cameron* element, the plaintiffs argued that the lender/defendant and builder/defendant were inextricably intertwined as an alternate theory to prove their consumer status. *Id.* The San Antonio Court of Appeals held that there was some evidence to support the jury's finding that the defendants were not so inextricably intertwined. *Id.*

■ Even though *Briercroft* applied this theory when the second *Cameron* element was not met, *Briercroft* did not limit its application in such a way. Neither has any other case so limited the application of this theory. Furthermore, the appellees incorrectly argue that the second *Cameron* ele-

ment was not met in either *Knight* or *Flenniken*. In *Flenniken* the supreme court specifically held that the house, the goods purchased, formed the basis of the complaint. *Flenniken*, 661 S.W.2d at 708. Thus, we decline to limit the materiality of Special Question # 18 to cases where a plaintiff fails to meet the second *Cameron* element.

### C. Despite the jury's answer, does the evidence establish as a matter of law that appellants sought to enjoy the benefit of the appellees' transaction?

Because Special Question # 18 is material in this case, the trial judge should have rendered judgment in favor of appellants on the DTPA issues unless appellees established as a matter of law their consumer status as to appellants. Appellees' cross-point argues that the evidence establishes as a matter of law that appellants sought to enjoy the benefit of the transaction between the appellees and the Billingsleys. They alternatively argue that the jury's failure to make such a finding was against the great weight of the evidence.

The jury's negative finding to Special Question # 18 means merely that the party with the burden of proof, the appellees, have failed to carry their burden of proving that fact. *Grenwelge v. Shamrock Reconstructors*, 705 S.W.2d 693, 694 (Tex.1986) (per curiam); *Siderius, Inc. v. Wallace Co.*, 583 S.W.2d 852, 861 (Tex.Civ. App.—Tyler 1979, no writ). Because we are uncertain as to why the trial court denied appellees' motion to disregard Special Question # 18, we first consider whether the court properly disregarded the negative finding. A trial court may not properly disregard a jury's negative finding and substitute its own affirmative finding unless the evidence conclusively establishes the issue. *New Process Steel Corp. v. Steel Corp.*, 703 S.W.2d 209, 216 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.); *Brownsville & Matamoros Bridge Co. v. Null*, 578 S.W.2d 774, 780 (Tex.Civ. App.—Corpus Christi 1978, writ ref'd n.r.e.); *see also Bond v. Otis Elevator Co.*,

388 S.W.2d 681, 685 (Tex.1965) (opinion on reh'g). In determining whether the evidence establishes an issue as a matter of law, we must first review all evidence in a light most favorable to the jury's finding and disregard all evidence and inferences to the contrary, to determine whether there is any evidence to support the finding. *See Trenholm v. Ratcliff*, 646 S.W.2d 927, 931 (Tex.1983); *New Process Steel*, 703 S.W.2d at 216. If there is no evidence to support the fact-finder's answer, then secondly, the entire record must be examined to see if the contrary proposition is established as a matter of law. *See Holley v. Watts*, 629 S.W.2d 694, 696 (Tex.1982).

To begin, we note that there is only one transaction as to the appellees, their purchase of the duplexes from the Billingsleys. *See Flenniken*, 661 S.W.2d at 707. Thus, we are searching for evidence to support the jury's conclusion that the appellants did not seek to enjoy the benefits of that sale.

Appellants argue that there is some evidence to support the jury's verdict because appellant Luker, Granbury's president and agent, never met appellees. Whether or not these two parties met is irrelevant, since we are only considering the appellants' relationship with the builder/defendants, the Billingsleys. *See Cameron*, 618 S.W.2d at 541 (consumer status is not defined by way of the relationship between the plaintiff and defendant).

Appellants next argue that they sought no benefit from the sale of the duplexes because they owned no interest in the properties. This is also irrelevant as no privity is required between the appellees and appellants. *See id.* Also, defendants do not have to have an ownership interest in property in order to seek to enjoy a benefit from its sale. *See Knight*, 627 S.W.2d at 389 (lender/defendant did not have an ownership interest in the truck being sold); *Flenniken*, 661 S.W.2d at 706 (lender/defendant did not have an ownership interest in the house being built).

We can find no evidence to support the jury's answer that appellants did not seek

to benefit from the transaction. However, after examining the entire record, we hold that the contrary proposition is established as a matter of law. First, there is a contract between appellants and the Billingsleys, dated October 18, 1983, which provides for the method of payment for the fifty-five lots in Meadowlark Estates Addition, including the lots appellees bought. The Billingsleys were to put $505.50 per lot as a cash down payment and then execute a promissory note for the balance. This promissory note provides for two payments, one when the foundation of each house is set and the other to be paid immediately after closing of the finished property to the investor with a permanent lender. The contract is signed by appellant Luker as president for appellant Granbury Properties and the Billingsleys' agent. It allows appellants to inspect the foundation. This is evidence that appellants sought to benefit from closing transactions between the Billingsleys and any buyers. The Billingsleys' agent, Joseph Morris Peterson, who signed the contract on behalf of the Billingsleys, recalled the underlying transaction, and corroborated this evidence.

The appellants did not have a lien on the promissory note but this does not mean that they did not seek to enjoy the benefits of the closing transactions. Appellant Luker testified that appellants received money from the Billingsleys as agreed. This evidence proves that appellants received money from the Billingsleys whenever there was a closing, despite the lack of a lien. While the Billingsleys fell through on their agreement, became bankrupt, and were released from their debts to appellants on August 31, 1984, this release did not occur until after the appellees had purchased their duplexes on or about March 9th of 1984. When appellees bought their duplexes, appellants were still seeking to enjoy the benefits between the closing made by the Billingsleys and their buyers. We hold that plaintiffs were consumers to all parties who sought to enjoy the benefit of

their transaction, including the appellants. Appellants' first point of error is overruled.

## II. WARRANTY OF GOOD AND WORKMANLIKE MANNER

Appellants' third and fourth points of error contest the submission of DTPA Special Questions 1(a) and 1(b) to the jury because they both incorrectly assume that an implied or express warranty is owed by the developer to the consumer. These questions read:

**SPECIAL QUESTION NO. 1**

**Did Defendant Granbury Properties, Inc., acting by and through Defendant Garry Luker, Sr., do any of the following:**

**Answer "Yes" or "No" for each.**

**(a) Fail to develop and or to replat the subdivision in a good and workmanlike manner?**

**(b) Fail to perform its duties under the Restrictions in a good and workmanlike manner?** [Emphasis added.]

The jury answered "yes" to both of these questions. These questions were submitted because of appellees' pleading that appellants' failure to develop in a good and workmanlike manner caused the septic problems. We will first consider whether there was an express warranty made to the appellees.

### A. Did appellants make an express warranty?

Express warranties are imposed by the agreements of parties to the contract. *La Sara Grain v. First Nat'l Bank*, 673 S.W.2d 558, 565 (Tex.1984) (citing *Rinehart v. Sonitrol of Dallas*, 620 S.W.2d 660, 662–63 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.)). Appellants made no express warranties to appellees that their development and platting of the land was suitable for the installation of septic systems. Appellants placed restrictions on the property deeded to the Billingsleys.[1]

---

1. Paragraph 19 of the Restrictions reads:
   All dwellings are to have a health approved sanitary sewer or septic system complete, which system must meet the requirements of

and be approved by the County and State Departments, and approved by the undersigned before occupancy. The undersigned does not guarantee that the lot is suitable in

These restrictions were recorded. We can find no authority to hold that a developer's restrictive covenants are express warranties to a DTPA consumer. Thus, we hold that there were no express warranties made to appellees.

### B. Do appellants owe an implied warranty?

■ Because we find no express warranties, the issue is whether Texas imposes on developers an implied warranty to develop property in a good and workmanlike manner for consumers who ultimately buy the property from a separate builder. The DTPA does not define the term "warranty," nor does it create any, so warranties must be established independently of the act. *La Sara Grain*, 673 S.W.2d at 565.

■ Implied warranties are created by operation of law and are grounded more in tort than in contract. *Humber v. Morton*, 426 S.W.2d 554, 556 (Tex.1968). Implied warranties are derived primarily from statute, although some have their origin at common law. *La Sara Grain*, 673 S.W.2d at 565. Thus, we must consider whether any statutes give rise to an implied warranty from developers to consumers. If they do not, then we must consider whether common law creates this warranty.

Appellants base their argument that there is no implied warranty in this case on section 5.023 of the Texas Property Code and its express negation of implied covenants. *See* TEX.PROP.CODE ANN. § 5.023 (Vernon 1984). However, this statute deals with covenants; it has nothing to do with implied warranties, which are different creatures. *See Humber*, 426 S.W.2d at 556. No statute mandates that there is no implied warranty in such a case as this. On the other hand, there is no applicable statute which creates this warranty so we must consider whether common law does.

■ Presently, no Texas case extends an implied warranty to developers. It is well-settled law that the builder/vendor impliedly warrants that a building constructed for residential use is constructed in a good and workmanlike manner and is suitable for human habitation. *Evans v. J. Stiles, Inc.*, 689 S.W.2d 399, 400 (Tex.1985) (per curiam) (citing *Humber*, 426 S.W.2d at 555)); *see also Gupta v. Ritter Homes, Inc.*, 646 S.W.2d 168, 169 (Tex.1983) (holding that these implied warranties extend to subsequent purchasers). These are the only two warranties recognized for the construction and sale of a house. *Miller v. Spencer*, 732 S.W.2d 758, 760 (Tex.App.—Dallas 1987, no writ); *March v. Thiery*, 729 S.W.2d 889, 892 (Tex.App.—Corpus Christi 1987, no writ).

The warranty of habitability is different from the warranty of good and workmanlike manner. "The warranty of habitability requires that a house be safe, sanitary and otherwise fit for humans to inhabit." *Miller*, 732 S.W.2d at 760. Our concern, the warranty of good and workmanlike manner has been defined as "the manner in which an ordinarily prudent person engaged in similar work would have performed *under similar circumstances.*" *Miller*, 732 S.W.2d at 760. By imposing this warranty, we would only impose on the developer a duty to act as an ordinary and prudent developer would.

*Humber* put an end to the *caveat emptor* rule in the sale of new homes by recognizing an implied warranty that the home was constructed in a good and workmanlike manner. *Humber*, 426 S.W.2d at 555–56. Appellees argue that *Humber* should now be extended to recognize an implied warranty from developers.

There is little authority in Texas which guides us in deciding this question of first impression other than Texas Supreme Court cases giving reasons for expanding theories of implied warranties. For example, the main reason the supreme court imposed implied warranties on builder/vendors is because the consumer relies on the skill of the builder and on its implied representation that the house will be erected in a reasonably workmanlike manner and will be reasonably fit for habitation. *Humber*, 426 S.W.2d at 560 (quoting *Schipper v. Levitt & Sons*, 44 N.J. 70, 207 A.2d 314

size to accommodate any size system that the purchaser may desire to put on said lot.

(1965)); *Gupta*, 646 S.W.2d at 169 (the builder is the only one who has or could have had knowledge of the manner in which the building was built).

Other reasons were provided when the supreme court extended these implied warranties to service transactions. *See Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 354 (Tex.1987) (opinion on reh'g). In *Melody Home*, the court stated: "An implied warranty arises by operation of law when public policy so mandates." *Id.* at 353. The court noted "the public interest in protecting consumers from inferior services is paramount to any monetary damages imposed upon sellers who breach an implied warranty." *Id.*

The supreme court held that a "service provider is in a much better position to prevent loss than is the consumer of the service." *Id.* Finally, the court expanded the warranty because consumers should be able to rely on the expertise of the service provider and the service provider is more able to absorb the cost of damages associated with inferior services than the individual consumer. *Id.* at 353–54.

■ Accordingly, we decide that a developer owes an implied warranty to develop in a good and workmanlike manner. The public interest in protecting consumers from inferior work is as present today as it was in *Melody Home*. In this case the specific loss that the consumers are complaining of is damage caused by septic problems. These problems were caused by small lot size as well as faulty installation.

The appellees are not the only consumers facing these hardships. For fifteen years, the Texas Department of Health has been concerned about consumers who are financially ruined by septic system failures caused by small lot size. 25 TEX.ADMIN.CODE § 301.11(a), (f)(4)(A) (West Supp. 1992) (Wastewater Surveillance and Technology), formerly 2 Tex.Reg. 4979, 4982 (1977) (Rules .001(a) & .002(b).[2] For fifteen years, the Texas Department has found:

> The single most important factor concerning public health problems resulting from these failures is the residential dwelling density which is primarily a function of lot size.... The failure of an absorption system on a small lot can be financially disastrous to the owner because the lot may not contain sufficient room to construct a new absorption field in a new location.

25 TEX.ADMIN.CODE § 301.11(f)(4)(A) (formerly 2 Tex.Reg. 4982 (Rule .002(b)(4)(A). There is as much public interest in protecting consumer home buyers from financial disaster caused by the failure of a sewage system as there is public interest in protecting consumers from financial disaster caused by buying houses that were constructed haphazardly.

The next question is whether the developers are in a better position to prevent this type of loss than the consumers. Appellants, the developers, platted the subdivision and the lot sizes, as any developer must. Also, in this case, deed restrictions gave appellants the power to approve or disprove of the improvements on the lots.[3] They exercised this power by sending a letter of approval to the builders.[4]

2. On March 1, 1992, this program was transferred to the Texas Water Commission and sections 301.11–301.18 were changed to sections 285.11–285.18. 17 Tex.Reg. 1650 (1992). On-site sewage disposal systems will eventually be regulated by the Texas Natural Resource Conservation Commission when it is created on September 1, 1993. Tex.S.B. 2, 72nd Leg., 1st C.S. (1991); *see* GUIDE TO TEXAS STATE AGENCIES 110 (Lyndon B. Johnson School of Public Affairs Project, 7th Ed.1992).

3. Paragraph 10 of the Restrictions reads:
   No residence or outbuilding shall be commenced, erected or maintained, nor shall any addition thereto or change or alteration thereof be made on any lot until plans and specifi-

cations, designs, and grading plans have been submitted to the undersigned, and they, as well as the site on which all buildings improvements or structures of any kind are to be constructed, have been approved by the undersigned.

4. The letter of approval reads:
   Being the developer of the Meadowlark subdivision and the author of the deed restrictions, I know word for word what the restrictions are and what my intent was in making them. Mr. Billingsley's duplexes in no way violate the subdivision restrictions and will be an asset not only to the Meadowlark Addition, but to the entire Granbury area.

These facts reveal that appellants were the only parties who were in a position to plat the subdivision. They were also the only parties whose approval was required to assure that the builders met their restrictions. We hold that the developer is in a better position to prevent loss by septic system failures because of lot size and because of the failure of the builder to conform to the deed restrictions. Further, most consumers do not have responsibility or experience in determining the lot size on which their new house is located, or in determining why and how certain deed restrictions should be followed. They must rely on the developer's expertise in this area and they should be able to rely on the expertise of the developer in these areas. Finally, the developer is more able to absorb the cost of damages associated with inferior development than the individual consumer.

While this is a question of first impression for Texas, *Jordan v. Talaga,* 532 N.E.2d 1174, 1184–85 (Ind.App. 4 Dist. 1989), most reflects appellees' arguments that an implied warranty of development in a good and workmanlike manner should be imposed on the developers. The facts of *Jordan* are that the defendants developed land, sold it to a builder who subsequently built a home and sold it to the plaintiffs. *Id.* at 1178. A little over a year later, the plaintiffs' home began flooding once or twice a year. *Id.* at 1179–80.

In *Jordan,* the court held that the *Jordan* developers "did more than sell raw land." *Id.* at 1185. The court held that they also:

[P]latted, subdivided, and engineered considerable improvements.... They put in the sanitary sewers, the storm sewers, and streets; they rough graded the lots all for the express purpose of facilitating the building of homes.

*Id.* They did this in an effort to provide for the drainage of water because they knew about a natural underwater channel. *Id.* at 1179, 1186. Further, the developers were professionals in real estate development and had developed seven subdivisions. *Id.* at 1185. All of this caused the *Jordan*

court to impose a warranty of habitability on the developer.

These facts substantially reflect those in the case before us. Appellants were professional developers and had developed twenty subdivisions all of which required septic systems. Appellants had several subsidiary companies that platted, subdivided, and engineered considerable improvements. While appellants did not put in sanitary systems, they did suggest to the builders whom to use, provided the backhoe to install the septic system, and gave advice as to where to install the system. Appellants, as developers, were responsible for the roads in Meadowlark Oaks Addition. Further, appellant Luker testified that the appellants developed Meadowlark Oaks Addition with the intention that each lot would ultimately be sold to a home buyer. In fact, appellant Luker unequivocally admits in his testimony that developers "absolutely" must develop in a good and workmanlike manner.

Because our facts are so similar to *Jordan,* we believe that the *Jordan* court's analysis is relevant to our issue even though it is not controlling. In reaching its decision to impose the more stringent warranty of habitability on these developers, the Indiana court stated:

We believe that under the circumstances, the application of the rule of caveat emptor ... to the original sale of the lot works a grave injustice upon the Talagas. Also, unscrupulous developers would be vested with impunity to develop marginal and unsuitable land. Homeowners would be left without a remedy for latent undisclosed defects in real estate not chargeable to the builder.

*Id.* at 1186. We agree. The caveat emptor rule as applied to developers is out of harmony with modern home buying practices. It does a disservice not only to the ordinary prudent purchaser but to the industry itself by lending encouragement to the unscrupulous, fly-by-night operator and purveyor of shoddy work. *See Humber,* 426 S.W.2d at 560. Accordingly, we affirm the trial court's submission of Special Questions 1(a) and 1(b) to the jury and hold that a develop-

er impliedly warrants to develop in a good and workmanlike manner. Points of error three and four are overruled.

## III. EVIDENCE TO SUPPORT THE JURY'S VERDICT AS TO SPECIAL QUESTION 1a

■ Appellants' second point of error is that there is no evidence to support the jury's verdict as to Special Question 1a that appellants failed to develop and or replat the subdivision in a good and workmanlike manner. We hold that there is more than a scintilla of evidence to support the jury's verdict.

■ In determining a "no evidence" point, we are to consider only the evidence and inferences which tend to support the finding of the jury and disregard all evidence and inferences to the contrary. *See Sherman v. First Nat'l Bank,* 760 S.W.2d 240, 242 (Tex.1988) (per curiam); *Larson v. Cook Consultants, Inc.,* 690 S.W.2d 567, 568 (Tex.1985); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951) (per curiam). If there is any evidence of probative force to support the finding of the jury, the point must be overruled and the finding upheld. *In re King's Estate,* 244 S.W.2d at 661–62.

The specific loss that the consumers are complaining of is damage caused by septic problems. There is more than a scintilla of evidence that these problems were caused by the size of the lots as well as the fact that the septic system was faulty. Appellants, the developers, were directly responsible for platting the subdivision and determining the lot sizes.

This is relevant in view of evidence that in Texas developers must develop residential subdivisions consistent with regulations and standards regarding septic systems. 2 Tex.Reg. 4979, 4982 (Rules .001(a) & .002(b) (codified at 25 TEX.ADMIN.CODE § 301.11(a), (f)(4)(A)). These state standards that set the minimum requirements were promulgated in 1977, before appellants began developing Meadowlark Oaks Addition. These standards at that time set a minimum lot size for different subdivisions, the smallest of which is 15,000 square feet. 2

Tex.Reg. 4982 (Rule .002(b)(4)(A). Yet, the lots that appellants platted no where met this minimum requirement. They are only 4,550 square feet. Appellants clearly ignored the minimum standards. We sustain the jury's findings that appellants failed in developing in a good and workmanlike manner because there is more than a scintilla of evidence that appellants did not develop the lot sizes in a good and workmanlike manner. Point of error two is overruled.

## IV. EVIDENCE OF MISREPRESENTATION

■ Appellants' fifth point of error is that there is no evidence or legally insufficient evidence to support the jury answer to Special Question # 1(e). It reads:

**Did Defendant Granbury Properties, Inc., acting by and through Defendant Garry Luker, Sr., do any of the following:**

**Answer "Yes" or "No" for each.**

. . . .

(e) **Represent that the septic systems would meet State requirements when, in fact, they did not?**

Once again, in determining this "no evidence" point, we will consider only the evidence and inferences which tend to support the finding of the jury and disregard all evidence and inferences to the contrary. *See Sherman,* 760 S.W.2d at 242; *Larson,* 690 S.W.2d at 568; *In re King's Estate,* 244 S.W.2d at 661–62. If there is any evidence of probative force to support the finding of the jury, we must overrule the point and uphold the finding. *In re King's Estate,* 244 S.W.2d at 661–62.

Our inquiry is whether there was any evidence that appellants represented that the septic system met state requirements and, if so, whether there was evidence that this representation was false. Disregarding all evidence to the contrary, there is evidence of both.

Appellant Luker signed a letter for the builders which confirmed that the builders in no way violated the Meadowlark subdivision restrictions. This confirmation letter was sent by the builders to the lending

institution which, ten days later, closed a loan for Mr. Arnold to buy the duplexes. This is more than a scintilla of evidence to support the jury finding that appellants made representations.

The evidence that appellants' representations were false is as stated above. Appellants clearly ignored the minimum standards for lot size, yet they represented that the minimum requirements were met. These representations were false. We sustain the jury's finding that the appellants represented that the septic systems would meet state requirements when, in fact, they did not.

## V. NEGLIGENT MISREPRESENTATION AND DUTY

The judgment awarded appellees $59,020.00 without distinguishing the grounds. We sustained the DTPA grounds under which the jury found damages of $59,020.00. Thus, there is no need for us to analyze appellants' sixth point of error that there is no duty owed by appellants to enforce deed restrictions and seventh point of error that there is no evidence to support the negligent misrepresentation.

## VI. ONE SATISFACTION OF DAMAGES

■■■ Appellees settled with the Billingsleys for $33,000.00 before trial. Appellants' eighth point of error is that the trial court erred in refusing to credit the jury award of $59,020.00 with the $33,000.00 paid by the settling co-defendants and in refusing to reform the judgment to credit such amounts. They base this contention on the "one satisfaction of damages" rule which originated in *Bradshaw v. Baylor Univ.*, 126 Tex. 99, 84 S.W.2d 703 (1935). This rule is that when there is "one injury, there can, in justice, be but one satisfaction for that injury." *Id.* at 705. Appellants argue that this rule applies to them so they are entitled to a dollar for dollar credit for the settlement made by appellees with the Billingsleys.

The *Bradshaw* rule was limited in *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 434 (Tex.1984). In *Duncan*, the su-preme court held that *Bradshaw* is not applicable in product liability cases. *Id.* at 432 (meaning that the nonsettling tortfeasors' liability will be determined by percentage of causation instead of dollar for dollar credits). However, the supreme court in *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 6 n. 7 (Tex.1991) specifically noted that suits based on the DTPA are exempted from the comparative causation schemes and are instead subject to the application of the original contribution scheme. Then the court held that *Bradshaw* is applicable to cases not covered by a comparative causation scheme. *Id.* at 12. This means that damages for DTPA actions are subject to *Bradshaw*.

Because *Bradshaw* applies, the trial court should have credited the award with the settlement if there was a single injury caused by both of the defendants below. However, there was more than one injury. The appellees were injured by being induced to buy property that was actually less valuable than they were told. This injury was solely caused by the builder/vendor's misrepresentations. Then, the property was even less valuable because of the septic problems. The septic problems also caused the appellees to lose out-of-pocket expenses for repair and replacement of the septic systems. These injuries were different from the injuries appellees suffered as a result of buying the property. On top of those injuries, the plaintiffs suffered mental anguish which is a separate injury from property loss.

A damage award for appellees' loss in property value and repairs and replacement cost because of the defective septic systems does not compensate appellees for the injuries they have suffered from the builders' misrepresentations as to the actual property value of the duplexes and the failure of the builders to complete the subdivision. The settlement agreement with the builders does not specify the reason for settlement, it could be for any of these reasons. Therefore, we cannot know which injury the award of $33,000.00 covered. *See Lloyd v. Ray*, 606 S.W.2d 545, 547 (Tex.Civ.App.—San Antonio 1980, writ

ref'd n.r.e.) (no way of ascertaining what portion of settlement was paid for what injuries). For this reason we affirm the trial court's actions in not reducing the judgment. Point of error eight is overruled.

## VII.  ASSIGNMENT OF CAUSE OF ACTION

Appellants' ninth point of error is that the written assignment of the Conns' cause of action was invalid for several reasons. First, they claim that the assignment fails on its face because it does not contain an acknowledgment or jurat. Appellants cite no authority that an assignment must contain an acknowledgement or jurat so they have waived this argument. TEX.R.APP.P. 74(f).

Second, appellants assert that the assignment is invalid because it was not delivered until the Conns were in bankruptcy so the cause of action assigned is the property of the debtors' bankruptcy estate. We hold that the assignment to the appellees was valid because the effective date of the assignment was October 19, 1987, the date it was signed. *See Briargrove Shopping Ctr. v. Vilar,* 647 S.W.2d 329, 337 (Tex.App.—Houston [1st Dist.] 1982, no writ) (treating the signing date as the date of assignment). Because we have held that the assignment was valid as a matter of law, then appellants' next contention, that appellees waived recovery on the assignment because the jury did not decide whether the assignment was valid, is without merit. *Akin v. Dahl,* 661 S.W.2d 911, 913 (Tex.1983) (a party waives a ground of recovery by failing to request its submission to the jury unless it is established as a matter of law), *cert. denied,* 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984). Point of error nine is overruled.

Appellants' tenth and final point of error is that the assignment from the Conns was barred by the statute of limitations. Because appellants filed only a general denial and did not affirmatively set forth this defense, this contention was waived. TEX.R.CIV.P. 94; *Phillips v. Phillips,* 820 S.W.2d 785, 789 (Tex.1991) (affir-

mative defense must be pled or it is waived).

We affirm the judgment of the trial court in favor of appellees. All costs, including those on appeal, are charged to appellants.