COLORADO COURT OF APPEALS
 2015COA167M
 
 

 
Court of Appeals Nos. 14CA0063 & 14CA0797
City and County of Denver District Court No. 10CV6699
Honorable Herbert L. Stern, III, Judge

Tad S. Rogers,
Plaintiff-Appellee and Cross-Appellant,
v.
Forest City Stapleton, Inc., and FC Stapleton II, LLC,
Defendants-Appellants and Cross-Appellees.

JUDGMENT AFFIRMED IN PART, REVERSED
IN PART, AND CASE REMANDED WITH DIRECTIONS
Division VI
Opinion by JUDGE ASHBY
Furman, J., concurs in part and dissents in part
Booras, J., concurs in part and dissents in part
Prior Opinion in 14CA0797 Announced November 19, 2015, WITHDRAWN
Opinion Modified
On the Court’s Own Motion
Announced November 19, 2015

Hamilton Faatz, PC, Clyde A. Faatz, Jr., Andrew C. Iverson, Greenwood Village, Colorado, for Plaintiff-Appellee and Cross-Appellant
Brownstein Hyatt Farber Schreck, LLP, Hubert A. Farbes, Jr., Jonathan G. Pray, Kathryn A. Barrett, Denver, Colorado; Senter Goldfarb & Rice, L.L.C., John D. Hayes, Denver, Colorado, for Defendants-Appellants and Cross-Appellees

OPINION is modified as follows:

The caption is modified to reflect the consolidation of cases 14CA0063 and 14CA0797. 

¶1         Defendants, Forest City Stapleton, Inc., and FC Stapleton II, LLC (collectively Forest City), appeal the judgment of liability based on jury verdicts finding that they breached their implied warranty to, and created a nuisance against, plaintiff Tad S. Rogers. We conclude that an implied warranty of suitability can exist between a developer who sells a vacant lot and a homeowner who is not the first purchaser of that lot. However, because the trial court did not properly instruct the jury about the circumstances that give rise to such an implied warranty and the jury did not make factual findings related to those legal issues, we are unable to determine whether such an implied warranty exists here.
¶2         We also conclude that the evidence was insufficient to support the jury’s verdict on the nuisance claim. Therefore, we reverse the implied warranty and nuisance judgments and remand for retrial on only the implied warranty claim.
I. Background
¶3         Forest City is the master developer for the redevelopment of the old Stapleton International Airport into a mixed-use community that will include about 12,000 residences. As master developer, Forest City subdivides the approximately 4700 acres into lots, some of which are for residential use. Forest City then sells the residential lots to homebuilders, who build homes on the lots and sell them to homeowners. Although Forest City does not itself build the homes, it does select the builders and styles of homes that can be built on each individual lot to maintain a desired architectural and design aesthetic for the Stapleton community.

¶4         Park Creek Metropolitan District (PCMD), a governmental subdivision of the state, was responsible for installing the public infrastructure in Stapleton, including the roads. To help it accomplish the infrastructure installation, PCMD hired Forest City as its development manager. As development manager, Forest City made recommendations to the PCMD board regarding which trade contractors it should hire to install the infrastructure. The PCMD board considered those recommendations and then entered into contracts with trade contractors of its choice to build the infrastructure.
¶5         Forest City sold the vacant residential lot at issue here to a homebuilder, with which Rogers contracted to build a home. Rogers paid the builder an extra fee to include a basement that could later be finished. The home also included a foundation drain system designed to collect ground water into a sump pit and be pumped out into the yard by a sump pump. After Rogers moved into the home, he noticed that the sump pump was operating more often than he expected and, after hiring engineers to investigate, discovered that the ground water level was higher than he had believed it to be.

¶6         Rogers filed suit against Forest City, asserting numerous claims. The only claims litigated at trial were those for breach of implied warranty, nuisance, and negligent misrepresentation. Rogers’ breach of implied warranty claim alleged that Forest City impliedly warranted to him that his lot was suitable for a home with a basement that could be finished, when in fact it was not. His nuisance claim alleged that a mineral called calcite leached out of the recycled concrete aggregate base course (RABC) used to construct the roads in Stapleton and hardened in his foundation drain system, interfering with its function. He alleged that Forest City was liable for this “by having placed RABC in the roadbed adjacent to [his home].”
¶7         At trial, Forest City named the homebuilder and several others as nonparties at fault. Both sides presented a large amount of expert testimony from engineers about the nature of the subsurface on Rogers’ lot, how suitable the lot was for a home with a basement, the condition and functionality of the foundation drain system, and the consequences of using RABC in building roads, among other topics. The jury found for Rogers on all three claims and awarded damages. Forest City appeals the judgment on the breach of implied warranty and nuisance claims.
II. Breach of Implied Warranty Instruction
¶8         Forest City argues that the trial court erred by instructing the jury that it could find that an implied warranty runs from a developer to a homeowner under the circumstances of this case. We review de novo whether the trial court’s instruction properly stated the law. Day v. Johnson, 255 P.3d 1064, 1067 (Colo. 2011). We conclude that the trial court’s instructions did not accurately inform the jury regarding when an implied warranty runs from a developer to a homeowner.
¶9         Several Colorado cases have addressed whether, and under what circumstances, an implied warranty runs from the seller of a vacant residential lot to the individual who eventually purchases a home built on that lot. Two of these cases, when considered together, help define the circumstances under which such an implied warranty exists.

¶10         In Rusch v. Lincoln-Devore Testing Laboratory, Inc., 698 P.2d 832 (Colo. App. 1984), the developers sold an undeveloped but improved lot to the homeowner, who then acted as his own contractor and built a home on the lot. Id. at 833. After the home was built, subsidence and lateral movement of the soil beneath the home caused extensive structural damage to the home. Id. The homeowner sued the developer for breach of implied warranty of suitability. Id. at 834. A division of this court was asked to decide whether the trial court erred by instructing the jury that a parcel of land purchased for the purpose of building a home on it carries with it an implied warranty that it was suitable for that purpose. Id.
¶11         The division noted that implied warranties of habitability and workmanlike construction are based on the fact that builder-vendors and purchasers from builder-vendors are rarely in equal bargaining positions. Id. Instead, the
builder-vendor expressly or impliedly holds himself out as having the expertise necessary to construct a livable dwelling, and the purchaser relies upon the representations that the new house will be suitable as a home. These expectations reflect the fact that an experienced builder is in a far better position to evaluate the structural condition of a house than most purchasers.

Id. (citation omitted). The division then distinguished the sale of an unimproved lot from that of a lot that had been extensively modified for sale as a site for a home. Id. at 835. Because the purchaser of an improved lot, like the purchaser of a new home, is not in as equal a position as the developer to appreciate the existence or quality of these improvements, the purchaser will generally rely on the developer’s skill or expertise in making the improvements. Id. Accordingly, the division held that
$$if land is improved and sold for a particular purpose, if vendor has reason to know that the purchaser is relying upon the skill or expertise of the vendor in improving the parcel for that particular purpose, and the purchaser does in fact so rely, there is an implied warranty that the parcel is suitable for the intended purpose.
Id.
¶12         From the second case, Beeftu v. Creekside Ventures LLC, 37 P.3d 526 (Colo. App. 2001), we see that the reasoning in Rusch may support the conclusion that an implied warranty may run to a purchaser of the lot who is not the first purchaser.

¶13         In Beeftu, a developer graded a lot for residential construction, sold the lot to a builder, the builder built a home on it, and sold the home and lot to a homeowner. Id. at 527. The grading plan the developer submitted to the city specified that any home built on the lot would not have a walkout basement because it would be incompatible with the grading and drainage plan for the lot. Id. Nevertheless, the builder built a home with a walkout basement and sold it to the homeowner. Id. The basement flooded repeatedly and the homeowner sued the developer for breach of implied warranty of habitability. Id. The trial court granted the developer summary judgment on that claim, and the homeowner appealed to a division of this court. Id. at 528.
¶14         The division assumed without deciding that an implied warranty could exist between the developer and the homeowner even though the homeowner was not the first purchaser of the lot. Id. But the Beeftu division held that the developer did not breach the implied warranty because (1) there was no evidence that the lot was unsuitable for a home, only evidence that the lot was unsuitable for a home with a walkout basement; (2) the decision to build a home with a walkout basement was solely the builder’s, not the developer’s; and (3) the developer played no part in the construction of the home. Id. at 528-29.

¶15         Together, Rusch and Beeftu demonstrate that an implied warranty of suitability exists when a developer sells a vacant lot if (1) the developer improves the lot for a particular purpose and (2) the purchaser relies on the developer’s skill or expertise in improving the lot for that particular purpose. The question left unresolved from these two cases which we must resolve here is whether such an implied warranty extends to a homeowner who is not the first purchaser of the lot. We conclude that it can, and we find the reasoning in Jordan v. Talaga, 532 N.E.2d 1174 (Ind. Ct. App. 1989), the case relied on by the trial court on this issue, persuasive.
¶16         In Jordan, developers improved a lot for the purpose of residential construction, sold it to a builder who built a house on the lot, and the builder sold the house and lot to the homeowners. Id. at 1178. The developers’ improvements included providing an easement on the edge of the lot for a drainage ditch that would keep a known natural and periodic flow of water away from the rest of the lot. Id. After their purchase, the homeowners’ lot repeatedly flooded, and they sued the developer for breach of implied warranty. Id. at 1179. The court rejected the notion that caveat emptor applied to the sale from developer to builder. Id. at 1186. It further held that an implied warranty that the lot would properly drain extended from the developer to the homeowner. Id. The court explained that if it held otherwise, “unscrupulous developers would be vested with impunity to develop marginal and unsuitable land” and “[h]omeowners would be left without a remedy for latent undisclosed defects in real estate not chargeable to the builder.” Id.; see also Luker v. Arnold, 843 S.W.2d 108, 117-18 (Tex. App. 1992) (citing Jordan, 532 N.E.2d 1174), overruling on other grounds recognized by Welwood v. Cypress Creek Estates, Inc., 205 S.W.3d 722 (Tex. App. 2006).

¶17         Forest City points out that some states have come to the opposite conclusion as that in Jordan. To the extent that Forest City relies on cases holding that the sale of a vacant lot never carries with it an implied warranty, see, e.g., Bernstein v. Ainsworth, 371 N.W.2d 682, 676-77 (Neb. 1985), those cases are contradictory to Rusch. And to the extent that Forest City relies on cases requiring contractual privity between the homeowner and developer, see, e.g., DeAravjo v. Walker, 589 So. 2d 1292, 1294 (Ala. 1991), we find the reasoning of Jordan more persuasive.

¶18         Lastly, we are not persuaded by the argument that it would be unfair to impose a warranty of habitability on a developer for a house that has not yet been built, and that the developer will not build, see Lehmann v. Arnold, 484 N.E.2d 473, 477 (Ill. App. Ct. 1985) (“A purchaser . . . need not and does not rely on any expertise of the seller of the land. Instead, he relies on the builder’s skill to insure that the home built on the property will be habitable. . . . To impose a . . . warranty in favor of the purchaser of the house would require the seller of land to control the actions of the builder.”). Rather, we think that if a developer uses its skill and expertise in improving the land, and the subsequent purchasers rely on that skill and expertise, it is fair to imply a warranty of suitability for those improvements.
¶19         We therefore conclude that an implied warranty of suitability exists between a developer of a vacant lot and the owner of a home on that lot who is not the first purchaser if (1) the developer improves the lot for a particular purpose and (2) all subsequent purchasers rely on the developer’s skill or expertise in improving the lot for that particular purpose. In this case, the trial court did not adequately instruct the jury on this law.

¶20         The trial court instructed the jury that for Forest City to be liable on the breach of implied warranty claim, the jury had to find that “(1) [Forest City] improved and sold the lot for the purpose of residential construction; and (2) [Forest City] impliedly warranted to [Rogers] that the lot was suitable for a home with a basement that could be finished; and (3) The lot was not so suitable; and (4) . . . any such unsuitability cause[d Rogers’] damages.”
¶21         There were two problems with this instruction. First, neither this instruction nor any other explained under what circumstances a developer “impliedly warrant[s]” something about a lot to a first purchaser or a subsequent homeowner. Specifically, the trial court did not instruct the jury that if Forest City improved the lot for a particular purpose, an implied warranty would exist that the lot was suitable for that particular purpose if the subsequent purchasers relied on Forest City’s expertise and skill in improving the lot. See Rusch, 698 P.2d at 835.
¶22         Second, the particular purpose for which Forest City allegedly developed the lot in the first element (“residential construction”) and impliedly warranted the lot in the second element (“suitable for a home with a basement that could be finished”) was different. To establish a breach of implied warranty claim, the developer must improve and sell a lot for a particular purpose and the lot must be unsuitable for that same particular purpose. See Beeftu, 37 P.3d at 528 (no breach of implied warranty because any implied warranty warranted only that the lot was suitable for a home without a walkout basement, which it was; lot was unsuitable only for a home with a walkout basement).

¶23         For these reasons, the trial court’s jury instructions did not accurately reflect the law regarding the conditions under which an implied warranty exists. Because of this instructional error, the jury did not make findings about the presence or absence of these conditions that would allow us to determine whether an implied warranty exists here. Consequently, we must reverse and remand for a new trial on the implied warranty claim. On retrial, the trial court should instruct the jury, pursuant to Rusch, Beeftu, and this opinion, about the factual circumstances under which an implied warranty runs from Forest City to Rogers and require the jury to make findings about whether these circumstances existed. Such an instruction might read:
For the homeowner to recover from the developer on the homeowner’s claim of breach of implied warranty, you must find by a preponderance of the evidence that
(1) the developer improved the lot for a particular purpose; and
(2) all subsequent purchasers, including the homeowner, relied on the developer’s skill or expertise in improving the lot for that particular purpose; and
(3) the lot was not suitable for the particular purpose for which the developer improved the lot and for which subsequent purchasers relied on it being suitable; and
(4) that unsuitability caused the homeowner’s damages.

¶24         The trial court should modify the instruction above to include case-specific details, such as the identity of the developer and homeowner and the particular purpose for which the lot was improved.
III. Insufficient Evidence to Support Nuisance Verdict
¶25         After the judgment, Forest City moved for judgment notwithstanding the verdict on Rogers’ nuisance claim, arguing that the evidence was insufficient to support the nuisance verdict as a matter of law. See C.R.C.P. 59(e)(1). The trial court denied the motion and Forest City now argues that this was error.

¶26         “When sufficiency of the evidence is challenged on appeal, we must determine whether the evidence, viewed as a whole and in the light most favorable to the prevailing party, is sufficient to support the verdict.” Parr v. Triple L & J Corp., 107 P.3d 1104, 1106 (Colo. App. 2004). We agree with Forest City that the evidence was insufficient to support the nuisance verdict as that claim was presented to the jury.
¶27         Rogers’ complaint alleged that Forest City created a nuisance by “having placed RABC in the roadbed” adjacent to his home. At the close of evidence, Rogers requested that the trial court instruct the jury that it could find Forest City liable for nuisance if it placed “or caus[ed] to be placed” RABC in the roadbed. The trial court acknowledged the difference between the two instructions, but based on its review of the complaint and trial management order, declined Rogers’ request, and instructed the jury that to find for Rogers on his nuisance claim it had to find, among other things, that “[Forest City] placed [RABC] in the roads around [Rogers’] house.” The trial court therefore specifically declined to instruct the jury that it could base its nuisance verdict on a determination that Forest City had caused RABC to be placed in the roads. And our review of the record reveals no evidence that Forest City placed RABC, or anything else, in the roads in Stapleton.

¶28         All the evidence showed that PCMD was responsible for installing the public infrastructure, including the roads. As development manager, Forest City made recommendations to the PCMD board about which trade contractors to hire to build roads and other infrastructure. But PCMD, not Forest City, ultimately decided whom to hire to build the roads and other infrastructure, and the contracts for the installation of this public infrastructure were between the trade contractors and PCMD, not Forest City.
¶29         We agree with Rogers that there was ample evidence of close ties between Forest City and PCMD, including the fact that two of the five seats on the PCMD board were occupied by Forest City executives. But regardless of these close ties, Forest City and PCMD are distinct entities. PCMD is a governmental subdivision of the state and Forest City is a private developer. And although there was evidence that Forest City played some role in managing the construction of the public infrastructure, there was no evidence that Forest City itself “placed” RABC in the roads in Stapleton.

¶30         Similarly, Rogers argues that there was evidence demonstrating that even if Forest City did not itself place RABC in the roads, it controlled or directed whatever entity did, and this was sufficient to support the jury’s verdict. We disagree. Regardless of whether and to what extent Forest City directed another entity to use RABC in building the roads, the instructions, based on Rogers’ complaint, required the jury to find that “[Forest City] placed [RABC] in the roads.” As discussed above, the trial court specifically rejected Rogers’ request to allow the jury to find that Forest City was liable for nuisance if Forest City caused RABC to be placed in the roads as opposed to placing RABC itself. Because the jury was instructed that Forest City placing RABC in the roads was a necessary element of the nuisance claim, the evidence was insufficient to support the jury’s nuisance verdict. The trial court therefore erred by denying Forest City judgment notwithstanding the verdict on that claim pursuant to C.R.C.P. 59(e)(1).
IV. Sanctions, Costs, and Other Issues
¶31         In a separate appeal, Rogers challenges the trial court’s order awarding him attorney fees and costs pursuant to discovery sanctions and costs as the prevailing party. Because we reverse the judgment on the nuisance claim and remand for a new trial on the implied warranty claim, we do not address the trial court’s prevailing party costs award. See Archer v. Farmer Bros. Co., 90 P.3d 228, 231 (Colo. 2004) (“When a case involves many claims, some of which are successful and some of which are not, it is left to the sole discretion of the trial court to determine which party, if any, is the prevailing party and whether costs should be awarded.”). However, based on the outcome on remand, the court may revise the prevailing party costs award if necessary.

A. Fees Awarded as Discovery Sanctions
¶32         The trial court awarded sanctions against Forest City’s counsel for the late disclosure of discovery documents, and awarded Rogers his reasonable and necessary fees and costs incurred as a result of the late disclosure. Rogers challenges only the amount of the award, not the legal basis on which the sanctions were imposed. Therefore, we review only for an abuse of discretion. See Pinkstaff v. Black & Decker (U.S.) Inc., 211 P.3d 698, 702 (Colo. 2009). 

¶33         Discovery sanctions “should be applied in a manner that effectuates proportionality between the sanction imposed and the culpability of the disobedient party.” Id. (quoting Kwik Way Stores, Inc. v. Caldwell, 745 P.2d 672, 677 (Colo. 1987)). If sanctions are warranted, courts should, after considering the full record of the case, “impose the least severe sanction that will ensure there is full compliance with a court’s discovery orders and is commensurate with the prejudice caused to the opposing party.” Id.
¶34         Here, in various written and oral orders, the trial court ruled that it would impose sanctions for the late disclosure in the form of “reasonable and necessary fees and costs” incurred due to Forest City’s counsel’s late disclosure. When it came time to determine the actual amount of these fees, Rogers claimed that they totaled over $90,000. The trial court disagreed, ruling that Rogers’ reasonable and necessary fees and costs incurred as a result of the late disclosure amounted to $10,000, and awarded him that amount.
¶35         We first reject Rogers’ argument that the $10,000 award was erroneous because it violated the court’s own sanctions order and therefore failed to follow the law of the case. The trial court’s refusal to award the full $90,000 that Rogers requested does not mean that it failed to follow its own orders. On the contrary, the trial court followed its own sanction orders and determined that only $10,000 of the $90,000 requested was reasonable and necessary.

¶36         Nor are we convinced, as Rogers suggests, that the trial court’s failure to enumerate the specific categories for which the fees were awarded reflected a failure to follow its own sanctions orders. From the trial court’s statement that the $10,000 in fees was “reasonably and necessarily incurred in connection with [Forest City’s] discovery violations,” we understand that the court considered all of the categories in calculating that amount.
¶37         We similarly reject Rogers’ argument that the trial court erred because awarding only $10,000 was unreasonable and nothing less than the entire $90,000 he requested was reasonable and necessary. When imposing discovery sanctions under these circumstances, the number of hours and hourly billing rates used to calculate the aggrieved party’s request is not a court’s only consideration. A court must also impose the least severe sanction to ensure full compliance with its orders that is also proportionate to the aggrieved party’s prejudice. Because the trial court found that (1) the late disclosed documents were of “slight use” to Rogers, (2) Forest City’s counsel acted with “candor and professionalism,” and (3) the violation was an unintentional “oversight,” we conclude that the trial court acted within its broad discretion by awarding only $10,000 of the $90,000 that Rogers requested. See Pinkstaff, 211 P.3d at 702 (“A trial court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair.”).

¶38         Finally, to the extent that Rogers argues in his reply brief that the trial court was required to award him the full $90,000 because Forest City presented no evidence, only argument, about the reasonableness and necessity of the fees and costs, we do not address that argument. See Grohn v. Sisters of Charity Health Servs. Colo., 960 P.2d 722, 727 (Colo. App. 1998) (appellate court will not address argument raised for first time in reply brief).
B. Rogers’ Expert Witness Costs for Costs Hearing
¶39         Rogers also requested that the trial court require Forest City to pay for the attorney he hired to testify at the costs hearing that the $90,000 in fees he was requesting in connection with the discovery violation were reasonable and necessary. The attorney testified only that the hours billed and hourly rates were reasonable. The trial court treated this as a request for prevailing party costs and found that the costs charged by the expert attorney “were excessive and/or unnecessary.” Because this determination is “left to the sole discretion of the trial court,” we do not disturb it. Archer, 90 P.3d at 231.

C. Construction Defect Action Reform Act
¶40         On cross-appeal, Rogers argues that the trial court erred by ruling that the Construction Defect Action Reform Act (CDARA) applies to the damages awarded on the nuisance claim. Because we conclude that Forest City was entitled to judgment notwithstanding the verdict on the nuisance claim, Rogers’ CDARA argument is moot.
V. Conclusion
¶41         The judgment on the implied warranty claim is reversed, the trial court’s order denying Forest City’s motion for judgment notwithstanding the verdict on the nuisance claim is reversed, and the trial court’s sanction award is affirmed. The case is remanded to the trial court for a new trial consistent with this opinion on the implied warranty claim and further proceedings as necessary.
JUDGE FURMAN concurs in part and dissents in part. 

JUDGE BOORAS concurs in part and dissents in part.

 

JUDGE FURMAN, concurring in part and dissenting in part.
¶42         The majority reverses the judgments based on claims of implied warranty of suitability and nuisance, and remands for retrial on only the implied warranty claim. As to the nuisance claim, I agree with the majority that the evidence was insufficient. But, I disagree with the majority that Forest City could be liable to Rogers on the claim of implied warranty of suitability because (1) Rogers was not the first purchaser of the lot; (2) Rogers did not rely on Forest City’s expertise; and (3) the lot at issue was generally suitable for the purpose of residential construction. I thus conclude that the evidence presented at trial also was insufficient, as a matter of law, to support the claim of implied warranty against Forest City.
¶43         Accordingly, I respectfully concur in part and dissent in part.
¶44         The only circumstance where Colorado courts have recognized an implied warranty in connection with the sale of an undeveloped lot is when a developer sells an improved lot to a purchaser who (1) is not a professional builder and (2) constructs his or her own house on the lot. That was the case in Rusch v. Lincoln-Devore Testing Laboratory, Inc., 698 P.2d 832 (Colo. App. 1984). 

¶45         In Rusch, the plaintiff purchased a lot from the developer. At the time, no structures had been built on the lot, although the developer had modified the ground to facilitate construction. After the plaintiff built his own house on the lot, the house was damaged based on the condition of the subsurface fill on which the house was built. In upholding the trial court’s award for breach of implied warranty, the division held that, where “a commercial developer improves and sells land for the express purpose of residential construction, an implied representation to a purchaser arises that the property is suitable for the residential purpose for which it is sold.” Id. at 835.
¶46         I conclude that Rusch is inapposite because Rogers did not purchase a vacant lot from Forest City and then build his own house. Instead, Forest City sold the lot to a professional builder, who conducted his own investigation into the suitability of the lot, modified the lot, built improvements on the lot, and sold the lot to Rogers.
¶47         Unlike Rusch, I conclude that Beeftu v. Creekside Ventures LLC, 37 P.3d 526 (Colo. App. 2001), is analogous to the present case. In Beeftu, a developer submitted to the city a grading plan identifying lots that were not suitable for houses with basements. Id. at 527. The developer subsequently sold one of those lots to a builder and, without the developer’s knowledge, the builder built a house with a basement. The basement flooded, and the homeowner sued the developer for breach of implied warranty of habitability. Id. The division held that the developer was not liable for breach of implied warranty because the plaintiffs, as subsequent purchasers, did not rely on the developer’s expertise, and the land at issue was suitable for the purpose of residential construction — although not the type of house plaintiffs wanted. Id. at 528.

¶48         As in Beeftu, there is no indication here that the fault was attributable to Forest City. Thus, I conclude that the evidence was insufficient to support the jury’s verdict because, as noted, Rogers did not rely on Forest City’s expertise in determining the type of house he wanted to build, and did not contest that the lot was suitable for residential construction. In other words, the evidence did not show the following:

 Forest City had represented to him that the lot was suitable to build a house with a basement; 
  Forest City had participated in the engineering of the house or the methods by which it was constructed, or the builder’s decision to include a finished basement; and Forest City played any part in the actual construction of Rogers’ home.

Parr v. Triple L & J Corp., 107 P.3d 1104, 1106 (Colo. App. 2004).
¶49         Jordan v. Talaga, 532 N.E.2d 1174 (Ind. App. 1989), does not compel a different result. In Jordan, the developer sold empty lots to homebuilders that constructed houses on the lots. During the development of the lots, the developer learned that a channel of water crossed through the subdivision and bordered the lot eventually purchased by the homeowner. The developer subsequently — but unsuccessfully — implemented techniques to try to divert the channel of water away from the homeowner’s lot. Id. When it purchased the lot from the developer, the homeowner did not know that the water channel swelled periodically into a stream that flowed onto and across the lot. Id. The court held that a professional developer breaches an implied warranty of habitability when he “improves land for the express purpose of residential homebuilding with knowledge but without disclosure of a latent defect in the real estate that renders the land unsuitable for the purpose of residential homebuilding.” Id. at 1182. In contrast to Jordan, no evidence was presented at trial that Forest City knew of high groundwater levels before Rogers purchased the lot.

¶50         Accordingly, I would vacate the jury’s verdict that was based on an implied warranty of suitability.
 

JUDGE BOORAS, concurring in part and dissenting in part.
¶52I concur with the conclusion that the jury was not properly instructed as to the implied warranty of suitability, but I respectfully dissent from the conclusion that the evidence was insufficient to support the jury’s verdict on Rogers’ nuisance claim.
¶53In reviewing the sufficiency of the evidence to support a jury verdict, we view the evidence in the light most favorable to the parties seeking to sustain the judgment. Pearson v. Kancilia, 70 P.3d 594, 597 (Colo. App. 2003). If there is any evidentiary basis for the verdict, we do not disturb it on review. Id.
¶54The majority rejects Rogers’ argument that evidence that Forest City controlled or directed PCMD to place RABC in the roads in the Stapleton development was sufficient to support the jury’s verdict. Although Rogers’ complaint alleged that Forest City “placed” RABC in the Stapleton roads rather than “caused to be placed,” I view the use of the word “placed” as including the direction or use of other entities to accomplish the act of placing. See United States v. Brandom, 320 F. Supp. 520, 526 (W.D. Mo. 1970) (noting that the word “places” in mail fraud statute may have the meaning of “cause to be placed”); see also State v. Wilson, 509 N.W.2d 128, 130-31 (Wis. Ct. App. 1993) (“A direct actor can use another person, a place or an object to indirectly transfer a substance. The essence is the intent to transfer and the ability to cause that transfer.”).

¶55      In this case, the parties disputed Forest City’s responsibility for the placement of the RABC. Forest City’s evidence demonstrated that Forest City was simply a manager, did not design the roads, and had no reason to question the suitability of the RABC. Attorneys for Forest City contended that Forest City did not place the RABC in the roads because that was done by a trade contractor of PCMD. However, Rogers relied on evidence that Forest City “essentially controls [PCMD].” The jury resolved this difference in favor of Rogers.
¶56Evidence supported the jury’s verdict. There was testimony that as development manager, Forest City “guides [PCMD] and its contractors and designers towards developing the residential and commercial [sic] at Stapleton and the infrastructure for that.” Forest City’s senior vice president of construction acted pursuant to a development manager agreement between Forest City and PCMD. He participated in discussions as to whether the RABC would be used. Testimony also established that two of the five PCMD board members were officers of Forest City, and that the PCMD board had never disagreed with any recommendations made by Forest City.

¶57Viewed in the light most favorable to the judgment, I agree with the trial court that the evidence was sufficient to support the jury’s determination that Forest City “placed” the RABC in the Stapleton roads. Therefore, I would affirm the judgment of liability on the nuisance claim. In light of the majority’s conclusion to the contrary, I do not address the related argument concerning whether the Colorado Construction Defect Action Reform Act limits damages for this claim.