The **PARKWAY COMPANY, Parkway Company of Texas, and Sugar Creek Corporation, Appellants,**

v.

**Ray WOODRUFF, Constance Woodruff Presley, Mickelson & Klein, Inc., and Vansickle, Mickelson & Klein, Inc., Appellees.**

No. 01–92–00157–CV.

Court of Appeals of Texas, Houston (1st Dist.).

June 10, 1993.

Rehearing Denied July 22, 1993.

Edward J. Hennessy, Randall D. Wilkins, Houston, for appellants.

Michael T. Powell, Amy Dunn Taylor, Houston, for appellees.

Before OLIVER–PARROTT, C.J., and COHEN and HEDGES, JJ.

## OPINION

OLIVER–PARROTT, Chief Justice.

This is a suit for damages resulting from the flooding of residential property. Ray and Constance Woodruff (the Woodruffs[1]) sued The Parkway Company, Parkway Company of Texas, and Sugar Creek Corporation, (Parkway[2]), alleging that the developers diverted surface water across their property by placing dirt fill and a concrete wall adjacent to their property. The Woodruffs asserted causes of action for negligence, gross negligence, violation of the Texas Water Code, private nuisance, trespass, and violations of the Texas De-ceptive Trade Practices Act (DTPA).[3] Parkway, in turn, brought third-party actions against more than one engineering firm, the homebuilder, and an adjacent property owner. Various other third party actions and cross-actions, irrelevant to this appeal, were also filed.

In one third-party action, Parkway sued the engineering firms of Mickelson & Klein, Inc. and Vansickle, Mickelson & Klein, Inc. (collectively, Mickelson), asserting negligence in the design and construction of a wall placed adjacent to the Woodruffs' east property line and parallel to the back property line of the lots in section 34. The trial court directed a verdict in favor of Mickelson on that third-party claim.

After trial to a jury, judgment was rendered in favor of the Woodruffs against Parkway on their theories of negligence, DTPA violations, Water Code violations, and the knowing breach of an implied warranty. Parkway obtained a judgment for indemnity against one engineering firm that is not a party to this appeal. The judgment denied relief as to all other parties and claims. Parkway appeals, raising 13 points of error. The Woodruffs bring a single cross-point.

## Factual Background

In April 1981, the Woodruffs bought the home located on lot 55 of section 24 of the Sugar Creek subdivision, a residential "master planned" community. As the developer of the Sugar Creek subdivision, Parkway provided all necessary services to develop and prepare raw land for sale to builders, who then built homes on the land for sale to buyers such as the Woodruffs. Parkway was responsible for such development services as the master planning of layout, planning and implementation of flood control, drainage, elevations, gradings, streets and utilities, including storm

1. Ray and Constance Woodruff divorced before trial, and Constance Woodruff changed her last name to Presley. However, as they refer to themselves as "the Woodruffs" throughout this record, we will do the same.

2. Appellants explain that at the time of trial, "The Parkway Company" was the correct name of the only existing corporate defendant. Sugar Creek Corporation was merged into The Parkway Company before suit was filed.

3. Tex.Bus. & Com.Code Ann. § 17.41 et seq. (Vernon 1987).

sewers, and all subdivision management and maintenance.

At the time of the Woodruffs' purchase in section 24, section 34 of the subdivision, which directly abuts the eastern boundary of the Woodruffs' lot, was undeveloped. The area north of the Woodruffs' lot, which is also abutted on the east by section 34, is a large commercial tract known as the Kaneb tract. The back yards of the houses in section 24, including the Woodruffs' back yard, and the back yards of the houses on the west side of Lakeside Boulevard in section 34 abut the Kaneb tract.

In February 1983, Parkway began development of section 34, initially by regrading that portion of the section that ran alongside the eastern border of the Woodruffs' lot. Included in the development plan was the proposed construction of a concrete wall along the eastern side of lot 55. Before the work began, water from the Kaneb tract had drained naturally into a "swale"[4] along and outside the northernmost corner of the Woodruffs' land and across the undeveloped lots (lots 1 and 2) in section 34 that abutted the Woodruffs' side yard. After the regrading began, the Woodruffs communicated to Parkway by letter dated February 3, their concerns that the regrading had altered drainage patterns. They urged Parkway to consider the impact that further construction of the concrete wall would have on the drainage of their property. Just six days later, on February 9, when a heavy rain occurred, the regrading activities had the predicted effect of diverting rainwater runoff onto the Woodruffs' property.

Parkway proposed to design and install drains to prevent future flooding on the Woodruffs' property and hired an engineering firm to prepare the plans. In fact, certain engineering work was done, including the installation of two drains. Parkway completed construction of the concrete wall in July of 1983. In August of 1983, during Hurricane Alicia, water came up to the slab of the Woodruffs' house and into their sunroom, which was lower than the main portion of the slab. In September of that same year during a rainstorm, the inside of the house flooded. In addition, during the 1983 flooding, water ran underneath the slab of the house, causing the slab to heave and resulting in structural damage. The Woodruffs' filed suit in 1984. The property flooded again in 1986 and in 1987.

Trial was to a jury. After finding the injuries to the property were permanent, the jury awarded damages for both cost of repairs ($100,000) and diminution of value ($120,000); out-of-pocket expenses ($14,000); mental anguish ($75,000 past and $10,000 future mental anguish for Ray and $25,000 past mental anguish for Constance Woodruff); additional discretionary damages for the knowing violation of the DTPA ($30,000); and attorneys' fees (33⅓% of all amounts recovered by the Woodruffs). The trial court entered judgment for all damages found by the jury for cost of repair and diminution in value, mental anguish, additional discretionary damages, and attorneys' fees, and awarded prejudgment interest on all damages, except future mental anguish. The judge refused to award the out-of-pocket damages.

### Consumer Status

◼ In its first point of error, Parkway complains that the evidence is legally insufficient to establish that the Woodruffs were consumers under the DTPA with respect to any transaction involving Parkway. Whether a claimant is a consumer is generally a question of law, not fact.[5] *Hol-*

---

4. A swale is a shallow depression in the ground. Parkway states that a natural swale across the back of lots 1, 2, and 3 of section 34 had diverted runoff from the Kaneb tract. When the engineering firm of Espey, Huston & Associates, Inc. designed section 34, in order to accommodate runoff they included a swale that followed the route of the pre-existing swale. It was built during the construction phase for sec-

tion 34 and was completed by February 1982. The concrete wall was not part of this design.

5. Whether a party is a consumer is typically a question of law for the trial court, unless some elements of the definition of consumer are in dispute. *Luker v. Arnold,* 843 S.W.2d 108, 111 (Tex.App.—Fort Worth 1992, no writ); *see also Security Bank v. Dalton,* 803 S.W.2d 443, 451 (Tex.App.—Fort Worth 1991, writ denied).

*land Mortgage. & Inv. Corp. v. Bone,* 751 S.W.2d 515, 517 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.); *Reed v. Israel Nat'l Oil Co., Ltd.,* 681 S.W.2d 228, 233 (Tex.App.—Houston [1st Dist.] 1984, no writ). To establish consumer status under the DTPA, the Woodruffs must show that (1) they sought or acquired goods[6] or services by purchase or lease, and (2) the goods or services form the basis of their complaint. *Melody Home Mfg. Co. v. Barnes,* 741 S.W.2d 349, 351–52 (Tex.1987); *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 539 (Tex.1981).

■ Parkway agrees that the Woodruffs' purchase, from the third-party seller, of lot 55 and the home on the lot, meets the first prong of the consumer status test, qualifying the Woodruffs as consumers in relation to the seller of the home. However, Parkway argues that because it was not a party to that transaction, the purchase of the home does not qualify the Woodruffs as consumers in relation to Parkway. We do not agree.

■ The supreme court has explained that standing as a consumer is established by the plaintiffs' relationship to the transaction.

> We find no indication in the definition of consumer in Section 17.45(4), or any other provision of the act, that the legislature intended to restrict its application only to deceptive practices committed by persons who furnish the goods or services on which the complaint is based.... The Act is designed to protect consumers from any deceptive trade practice made *in connection with* the purchase or lease of any goods or service....
>
> Consumer is defined in Section 17.45(4) only in terms of a person's relationship to a transaction in goods or services. It does not purport to define a consumer in terms of a person's relationship to the party he is suing. Section 17.45(4) ... does not say who a consumer can sue

under Section 17.50 for a deceptive trade practice violation. [It] expressly states that a consumer can bring a suit if he has been adversely affected by "the use or employment by *any person* of an act or practice declared to be unlawful in Section 17.46.... We, therefore, hold that a person need not seek or acquire goods or services furnished by the defendant to be a consumer as defined in the DTPA.

*Cameron,* 618 S.W.2d at 540–41 (emphasis in original). *See also Flenniken v. Longview Bank & Trust Co.,* 661 S.W.2d 705, 707 (Tex.1983); *Tuscarora Corp. v. HJS Indus., Inc.,* 794 S.W.2d 435, 441 (Tex. App.—Corpus Christi 1990, writ denied). Furthermore, contrary to Parkway's contention, there is no requirement that the deceptive act or practice be committed before or during the purchase or lease, only that it occur in connection with it.[7] *Cameron,* 618 S.W.2d at 541.

In *Luker,* a situation very similar to the case before us, the Fort Worth Court of Appeals considered a test for defining whether a particular defendant is "connected with" a transaction. *Luker,* 843 S.W.2d at 111. In determining whether Luker, a developer who was not a direct party to the plaintiff's purchase of real property, acted "in connection with" the purchase, the court asked whether the developer "sought to enjoy the benefits of the transaction" made the basis of the complaint. *Id.* The court relied on the analysis employed by the supreme court in *Knight v. International Harvester Credit Corp.,* 627 S.W.2d 382, 389 (Tex.1982), when it faced a similar question, whether Knight was a consumer in relation to a defendant who did no more than provide a loan for Knight's purchase of a truck.

The *Knight* court first determined that acquiring the loan and purchasing the truck were parts of a single transaction. Then, upon concluding that the defendant/lender's actions were "inextricably in-

---

**6.** Real property is a "good" under Tex.Bus. & Com.Code Ann. § 17.45(1) (Vernon 1987).

**7.** Under the holding in *Melody Home,* the Woodruffs' subsequent flooding problems related

back to their original purchase and were a continuation of that transaction. *See Melody Home,* 741 S.W.2d at 352.

tertwined" with the seller's and that the lender would benefit by its participation in the transaction in the form of collection of payment over time with interest, the court held that Knight was a consumer as to the lender. *Knight*, 627 S.W.2d at 389; *see also Qantel Business Sys. v. Custom Controls Co.*, 761 S.W.2d 302, 305 (Tex.1988) (whether defendants are inextricably intertwined with each other in a DTPA transaction is relevant for purposes of establishing whether the plaintiff is a consumer to all those defendants); *Flenniken*, 661 S.W.2d at 707 (from plaintiffs' perspective there was only one transaction, the purchase of a house, and plaintiffs were consumers as to all parties who sought to enjoy benefits of that transaction); *Bone*, 751 S.W.2d at 518 (by virtue of their "tie-in" relationship, both lender and builder sought benefits of transaction).

Thus, based on the reasoning in *Knight*, the *Luker* court ruled that once the party is recognized as a consumer in relation to the transaction, his consumer status is established in relation to all parties who sought to enjoy the benefits of the transaction. *Luker*, 843 S.W.2d at 114.

This analysis is applicable to the Woodruffs' situation. A developer develops a subdivision with the intention that each lot will ultimately be sold to a home buyer. *See Luker*, 843 S.W.2d at 117. Builders would not continue to purchase lots from Parkway unless they were successful in selling the homes built on those lots. Further, a builder's success in home sales in Sugar Creek likely relies, at least in part, on the quality of Parkway's continued services as developer. *Luker*, 843 S.W.2d at 117 (developer unequivocally admits that developers "absolutely" must develop in a good and workmanlike manner if the ultimate goal of selling homes is to be accomplished).

Specifically, Parkway testified through a company officer that it provided develop-

ment services for the Sugar Creek subdivision, including such services as drainage and flood control, in order to make a profit through the ultimate sale of homes. Parkway prepared lot 55 as part of those development services and sold the lot to a builder, thus realizing an immediate economic benefit. Further, each lot that Parkway sold to a builder, including lot 55, contributed to the ultimate success the Sugar Creek community as a whole, thus further benefitting Parkway. Thus, although Parkway was not the actual seller of the home on lot 55, Parkway directly benefitted from its sale. We conclude, therefore, that Parkway sought to enjoy the benefits of the transaction with the Woodruffs, and the Woodruffs are consumers in relation to Parkway as a matter of law. We overrule Parkway's first point of error.

**Breach of Warranty**

We next address whether a deceptive trade practice was, in fact, committed by considering Parkway's second and third points of error:

> The trial court erred by refusing to render a judgment in favor of Parkway with respect to the Woodruffs' claim that Parkway breached an implied warranty to perform development services in a good and workmanlike manner, because no such implied warranty in favor of a subsequent purchaser of a used home is recognized under Texas law.

> The trial court erred by refusing to render a judgment in favor of Parkway with respect to the Woodruffs' claim that Parkway breached an implied warranty to perform development services in a good and workmanlike manner, or alternatively, by refusing to grant a new trial on that claim, because the evidence is legally and factually insufficient to establish that the Woodruffs were ever a party to a contract which would support an implied warranty by Parkway.[8]

---

8. Although the jury failed to find that Parkway had engaged in any false, misleading, or deceptive act or practice by misrepresenting the characteristics, benefits, standard, or quality of the real estate, it did find that Parkway breached an implied warranty that its services as developer of the Sugar Creek subdivision would be performed in a good and workmanlike manner. "Warranty" was defined for the jury as an implied promise that services sold or offered for sale by Sugar Creek will be performed in a good and workmanlike manner. "Good and work-

### Requirement of a contract

We first address Parkway's contention that it had no contract with the Woodruffs that would support the existence of a warranty. We note here that while Parkway's third point of error challenges the sufficiency of the evidence to support a finding that the Woodruffs were party to a contract that would support any warranty, it does not challenge the sufficiency of the evidence to support the jury's finding of a *breach* of that warranty.

In *Gupta v. Ritter Homes, Inc.*, 646 S.W.2d 168 (Tex.1983), the supreme court expressly held that the implied warranties of habitability and good workmanship extend from a builder to a subsequent purchaser and protect the purchaser against latent defects not discoverable by a reasonably prudent inspection of the building at the time of sale. 646 S.W.2d at 169. In *Gupta,* the second owner of a home sued the builder/seller for breach of implied warranties after he discovered excessive settlement in the foundation of the home. In defense, the builder asserted the absence of a contract with the subsequent purchaser. The court in *Gupta* held that the implied warranty implicit in the contract between the builder/vendor and original purchaser is automatically assigned to the subsequent purchaser. *Gupta,* 646 S.W.2d at 169. Privity of contract is not required in breach of warranty claims under the DTPA. *Cameron,* 618 S.W.2d at 541. Thus the fact that the Woodruffs were subsequent purchasers of the home does not negate application of the implied warranty theory.

The supreme court further addressed the assertion in *Melody Home* that a contract must exist before imposition of a warranty and clarified that "implied warranties are created by operation of law and are grounded more in tort than in contract." *Melody Home,* 741 S.W.2d at 352; *see also La Sara Grain Co. v. First Nat'l Bank of Mercedes,* 673 S.W.2d 558, 565 (Tex.1984);

*Humber v. Morton,* 426 S.W.2d 554, 556 (Tex.1968). In *Nobility Homes of Texas, Inc., v. Shivers,* 557 S.W.2d 77, 78 (Tex. 1977), the supreme court held that a manufacturer impliedly warrants the merchantability of a mobile home to a purchaser with whom it is not in privity.

Thus we determine that a contract between Parkway and the Woodruffs was not required for the imposition of an implied warranty under the DTPA. We next consider whether such a warranty is recognized in Texas.

### Recognition of Implied Warranty

In October 1992, the Fort Worth Court of Appeals, in a case of first impression, considered "whether Texas imposes on developers an implied warranty to develop property in a good and workmanlike manner for consumers who ultimately buy the property from a separate builder." *Luker,* 843 S.W.2d at 115. After considering the reasoning of the supreme court in expanding implied warranty theories in related contexts, the Fort Worth court held that a developer owes an implied warranty to develop its property in a good and workmanlike manner. *Id.* at 117–18. We agree with the Fort Worth court.

In *Gupta,* the supreme court announced the policy reasons behind its extension of a builder's implied warranty of good and workmanlike construction to a remote purchaser: (1) a builder should be in the business of constructing buildings free of latent defects; (2) a buyer is not in the position to discern such defects; (3) a buyer cannot normally rely on his own judgment in such matters; (4) a buyer relies on the builder to construct the building in a good and workmanlike manner; (5) the builder is the only one who knows the manner in which the building was built. *Gupta,* 646 S.W.2d at 169. The effect of a defect on a subsequent purchaser is just as great as on the original buyer, and the builder is no more able to justify his improper work to a

---

manlike manner" was defined as "that quality of work performed by one who has the knowledge, training or experience necessary for the successful practice of a trade or occupation." In addi-

tion, the jury found that Parkway was negligent. Parkway does not challenge the negligence finding.

subsequent owner than he would be to the original buyer. *Id.*

In *Melody Home,* the court extended this theory further, holding that the sale of a service, in that case repairs, carries an implied warranty that the service will be performed in a skillful and workmanlike manner.[9] *Melody Home,* 741 S.W.2d at 354. On a policy level, the *Melody Home* court concluded that consumers like the Barneses in that case should be able to rely on the expertise of a service provider. *Id.* at 353. In addition, the provider of services is better able to prevent loss than is the consumer of the service, and the service provider is more able to absorb the cost of damages associated with inferior services through insurance and price manipulation than is the individual consumer. *Melody Home,* 741 S.W.2d at 353–54.

An implied warranty arises by operation of law when public policy so mandates. *Melody Home,* 741 S.W.2d at 353. Based on the development of warranty law in the context of real estate transactions, we believe that the extension of implied warranty theories to developers is not only logical but required by the policy underlying the imposition of all warranties. Certainly, the policy reasons stated for protecting the buyers in *Gupta* and *Melody Home* exist in the instant case.

A developer should be in business to develop property in a good and workmanlike manner; a homebuyer/consumer cannot, by reasonable examination, discern or anticipate irresponsible or defective subdivision development activities; nor can a homebuyer normally rely on his own judgment in assessing the activities of the developer; the homebuyer must rely on the developer in development of the subdivision; the developer is the only one who has or could have knowledge of the manner in which the subdivision is being developed. In addition, the developer is better able to prevent loss than is the homebuyer, and the developer is more able to absorb the cost of damages associated with inferior performance of its services than is the individual homebuyer.

Calling Sugar Creek a "master planned community" certainly suggests to a potential purchaser that each aspect of the development would be undertaken with concern for the rest of the development, that the subdivision would not be built piecemeal, and that the construction of one section would not, as happened here, be allowed to adversely affect another section. The concept of "master planning" also implies provision of continued competent development including flood control, drainage, management, and maintenance services.

We find it especially compelling that the problems that arose with the drainage on lot 55 were the direct result of Parkway's activities in its subsequent development of section 34. When the drainage problems became apparent, Parkway acknowledged its responsibility as developer and sought to correct, or "repair" the situation. At the same time, however, and even after it had notice of the potential problems, it proceeded with construction of the concrete wall.

Parkway argues that even if an implied warranty exists, it should be viewed just as any implied warranty, and if not breached when the Woodruffs purchased the property, then it is not breached. In short, Parkway asserts there can be no warranty for future development conduct. We do not agree. In the context of services, the warranty exists at the time the services are sought or acquired, *Melody Home,* 741 S.W.2d at 355–56, and, in cases such as this, where a developer expressly or impliedly promises further development activities and buyers purchase these future services as part of a subdivision "package," we see no reason why the warranty would not extend to those servic-

---

9. However, taking care to point out that the "sale" of a service did not require payment in cash for the service, the court reaffirmed its earlier holding that the absence of a cash sale is not determinative because DTPA plaintiffs establish their standing as consumers in terms of their relationship to a transaction, not by their contractual relationship with the defendant. *Melody Home,* 741 S.W.2d at 352 (citing *Flenniken v. Longview Bank & Trust Co.,* 661 S.W.2d 705, 707 (Tex.1983)).

es *to be performed.* Buyers, such as the Woodruffs, have no ability to predict or control the developer's activities in further development of other lots in the subdivision even though their property may be directly affected by that development.

■ Accordingly, we hold that a real estate developer impliedly warrants that its activities in the continued development of a planned community or subdivision will be performed in a good and workmanlike manner. By marketing the Sugar Creek subdivision as "master planned," Parkway impliedly warranted against the precise result that occurred. In addition, we further clarify that the nonexistence of a contract between the developer and subsequent purchaser is irrelevant to the existence of the warranty.[10] We overrule Parkway's second and third points of error.

## Unconscionability[11]

Parkway contends that the trial court erred in rendering judgment on the jury's finding that Parkway engaged in unconscionable conduct that was a producing cause of damages to the Woodruffs because the evidence was legally and factually insufficient to support the finding. Since the disposition of points of error two and three would support an award of actual damages, we need not address this alternative theory of recovery. We do not rule on Parkway's fourth point of error.

## Knowing violation

In its fifth point of error, Parkway contends that the trial court's judgment should be reversed because the evidence was legally and factually insufficient to support the jury's finding that Parkway knowingly violated the DTPA. Parkway states that it is impossible to provide record references in support of a no-evidence point. At trial, in opposition to the Woodruffs' claim of a

knowing violation, Parkway presented evidence that its officers and employees thought that the drainage problem had been resolved by the drains installed in February 1983.

■ A violation is "knowingly" committed when the defendant has actual awareness of the offending conduct or the breach of warranty giving rise to the consumer's claim. TEX.BUS. & COM.CODE ANN. § 17.45(9) (Vernon 1987). Actual awareness may be inferred where objective manifestations indicate that the defendant acted with actual awareness. *Id.* For purposes of determining whether conduct is committed knowingly, knowledge of industry standards may be imputed to one who does business in that industry. *Jim Walter Homes, Inc. v. Gonzalez*, 686 S.W.2d 715, 718 (Tex.App.—San Antonio 1985, writ dism'd) (home builder was deemed to have knowledge of substandard materials and procedures used in violation of building code); *March v. Thiery*, 729 S.W.2d 889, 894–95 (Tex.App.—Corpus Christi 1987, no writ) (trial court was at liberty to construe expert's testimony detailing defects in construction to be that a reasonably prudent builder would know that such defects constitute faulty construction and to impute such knowledge to builder). This rule of evidence lends credence to the jury's conclusion that Parkway, a developer of subdivisions, knew what a reasonably prudent developer would have known about the grading and drainage of lots 1 and 2 in section 34. *See March*, 729 S.W.2d at 894–95.

In addition, there was direct evidence of Parkway's actual awareness based on the fact that Ray Woodruff informed Parkway of the potential for drainage problems even

---

**10.** Although the issue was not raised in *Luker,* it is clear from a reading of that opinion that no contract existed between the Arnolds and the developer.

**11.** The case was submitted to the jury on five theories of liability: (1) negligence, (2) water code violations, (3) DTPA "laundry list" violations (i.e., false, misleading, or deceptive acts or

practices), (4) breach of implied warranty, and (5) unconscionable action or course of action. The jury found in favor of the Woodruffs on four of the five theories, failing only to find a misrepresentation (laundry list violation) by Parkway. The trial court entered judgment for the Woodruffs for actual damages on the other four theories.

before the wall was constructed.[12] This evidence was sufficient to support the jury's finding of a knowing violation. We overrule point of error five.

**Damages**

In its sixth point of error, Parkway contends that the trial court's judgment for both diminution in value and cost of repair damages is erroneous because (1) there was no evidence of the amount of diminution in market value after repairs, and (2) the award of both elements of damages constitutes a double recovery.

Extensive evidence was presented regarding the necessity, amount, and reasonableness of repairs to the Woodruffs' home. The Woodruffs' expert on repairs testified in detail about the extent of the structural damage caused by the drainage problem and the flooding. He also stated that it might be possible to repair the home permanently if the drainage problem were not fixed, but expressed doubt about the economic feasibility of doing so. The Woodruffs' expert appraiser testified that he had done two appraisals of market value as of September 19, 1983, one assuming the flooding, and attendant damages of a cracked slab, had occurred and one assuming it had not. The house was worth $240,000 before it flooded and without being subject to flooding. After it flooded and with the damages cause by the flooding, it was worth $120,000. If the slab were repaired and the flooding problem were eliminated, the fair market value of the house would still be negatively affected by the stigma associated with the flooding and repair. Parkway notes, however, that the appraiser did not determine the value of the house in a repaired condition.

▮ Parkway does not challenge the sufficiency of the evidence of damages, except for the alleged absence of evidence of *market value after repairs*. However, this focus ignores the fact that, in this case, the diminished value of the property was not subject to mitigation by any repairs that were made or might be made to the home. The property's value was diminished primarily by the drainage problem and the fact that, after the grading of section 34 and the concrete wall construction by Parkway, the Woodruffs' home was effectively placed in a three to ten-year flood plain. While the home repairs were necessitated by the flood damage, no amount of repairs to the house could correct the flooding problem. Therefore, the Woodruffs' recovery of the cost of repairs to the structure represents a wholly different element of damages from their recovery for diminution of value caused by the flooding. There was no double recovery.

The case relied on by Parkway is inapposite. *Ludt v. McCollum*, 762 S.W.2d 575 (Tex.1988), involved a situation where a homeowner recovered damages for the cost to repair his home's foundation problem and damages for permanent reduction in value before the repairs were made. There was no showing by the homeowner of permanent reduction in market value subsequent to the foundation repairs. Absent such a showing, the supreme court held that the homeowner could not recover both the cost of the repairs and reduction in value before the repairs were made. The court clearly acknowledges, however, that an aggrieved consumer may be able to plead, prove, and obtain favorable jury findings establishing both repair costs and permanent reduction in value notwithstanding such repairs, as cumulative rather than mutually exclusive measures of damages. *Ludt*, 762 S.W.2d at 576; *see also Brighton Homes, Inc. v. McAdams*, 737 S.W.2d 340, 342 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.); *Terminix Int'l, Inc. v. Lucci*, 670 S.W.2d 657, 661–62 (Tex. App.—San Antonio 1984, writ ref'd n.r.e.).

The purpose of the DTPA is to fully compensate the consumer for his or her actual damages. *See Brighton Homes*, 737 S.W.2d at 342. Here, neither the damages for cost of repairs nor the damages

---

12. On February 3, 1983, Woodruff sent a letter to Parkway stating his concerns that the new construction in section 34 and the proposed wall would create flooding. On February 9, 1983, Woodruff told Parkway by telephone that the fill on lots 1, 2, and 3 and the concrete wall had diverted surface water from the Kaneb tract onto lot 55.

for diminution in value, standing alone, would fully compensate the Woodruffs for their loss. We overrule Parkway's sixth point of error.

**Mental Anguish Damages**

In points of error seven, eight, and nine, Parkway challenges the trial court's award of mental anguish damages on the following grounds:

(1) there was no proof of a knowing violation of the DTPA, and no other theory supports an award of such damages for negligent damage to property;

(2) the evidence was legally and factually insufficient to support a finding that it was reasonably foreseeable that the property damage would cause mental anguish severe enough to be legally compensable, and thus the evidence was insufficient to establish proximate cause; and

(3) the damages were excessive and should be reduced by remittitur.

▪ Mental anguish damages are recoverable under the DTPA upon proof of a knowing violation of the act. *Luna v. North Star Dodge Sales, Inc.*, 667 S.W.2d 115, 117 (Tex.1984); *Kold–Serve Corp. v. Ward*, 736 S.W.2d 750, 756 (Tex.App.—Corpus Christi 1987), *error dism'd*, 748 S.W.2d 227 (Tex.1988) (upon proof of knowing violation by defendant, plaintiff who establishes such damages is entitled to recover for mental anguish); *see also HOW Ins. Co. v. Patriot Fin. Serv. of Texas, Inc.*, 786 S.W.2d 533, 543 (Tex.App.—Austin 1990, writ denied) (mental anguish damages are recoverable in DTPA action even in absence of other economic or physical harm).

▪ Thus, our holding in regard to point of error number five, that the evidence supports the jury's finding of a knowing violation of the DTPA, resolves Parkway's complaint raised in part one (1). This holding also renders moot Parkway's complaint regarding foreseeability in part two (2). Parkway complains that the Woodruffs failed to establish the foreseeability of their mental anguish damages

and, thus, failed to establish the element of proximate cause. However, the causation standard under the Deceptive Trade Practices Act is "producing cause," which does not encompass the element of foreseeability (as does proximate cause). Therefore, a consumer need only prove the amount of damages *actually caused* by the violation. *St. Elizabeth Hosp. v. Garrard*, 730 S.W.2d 649, 654 (Tex.1987);[13] *Hycel, Inc. v. Wittstruck*, 690 S.W.2d 914, 922 (Tex.App.—Waco 1985, writ dism'd); *Rotello v. Ring Around Products, Inc.*, 614 S.W.2d 455, 461 (Tex.App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.).

*Sufficiency of the evidence of mental anguish*

▪ We next consider the sufficiency of the Woodruffs' evidence of mental anguish. Proof of mental anguish requires a showing of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *J.B. Custom Design and Building v. Clawson*, 794 S.W.2d 38, 43 (Tex.App.—Houston [1st Dist.] 1990, no writ). Parkway claims that there is no evidence of a "high degree of mental pain and distress" to support mental anguish damages. Alternatively, it claims the evidence is factually insufficient and requests that this Court order a remittitur of one-half of the amounts awarded. The standard for remittitur is the factual sufficiency of the evidence to support the jury's finding of damages. *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex.1987); *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex.1986). To order a remittitur, this Court must find that the evidence supporting the damage award is so factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pope*, 711 S.W.2d at 624.

▪ Analyzing the no-evidence point, we must review the record in the light most favorable to the jury findings, considering only the evidence and inferences supporting such findings. *Clawson*, 794

13. This case has been partially overruled by *Boyles v. Kerr*, 855 S.W.2d 593 (Tex.1993), for the proposition of a general duty of negligent infliction of emotion distress.

S.W.2d at 42. In support of the jury's award of mental anguish damages, the Woodruffs cite the following testimony from Ray Woodruff about his mental stress from the September 19 flooding:

I was hot. I was very disturbed about that, and called him and said, "I would like to sell you a house. I think you have just flooded my property, I think you have messed up my house." I begged the guy not to. On a couple of occasions I said, "Please, don't foul-up my house. You know, you're into an area here, you've got to make sure you've got help, you got qualified people to take care of this problem, please don't mess up my house. I don't have time to mess with this, I've got things to do." And it was no problem, we're incomparable Sugar Creek. He didn't say that, but that's the attitude I got. We know what we're doing and we'll take care of it.

Constance Woodruff testified as follows about the mental anguish the couple experienced:

Q: So during that interim period of time, were you walking around on other carpet that you had purchased or what?

A: No, we were walking around on cement floors. I mean, you can mop them and try to make them look or smell clean, but it's just not pleasant walking around on cement floors.

Q: Was your kitchen carpeted?

A: Yes, it was.

Q: Was that part of the carpet that was ruined?

A: Yes, that was pulled out too.

Q: So did you ever drop anything on the floor without carpet on it?

A: Yes, I would break, occasionally break things in the kitchen, we all drop things in the kitchen but the thing to remember, which Ray was upset about, I had taken his grandfather's gold pocket watch off of the dresser in the bedroom, and I dropped it and it smashed. He wasn't too excited about that.

Q: What do you recall about the refinishing of the tile?

A: Well, Saltillo tile is sealed with a— I'm not sure, it's a clear glaze which they had to use some chemical to dissolve that glaze on the tile, and the chemicals were really strong, so we had to leave the house. I remember going back into the house and it was sort of like a fog. It burned my nose and eyes. It was like a white fog so it took several days to finish that much tile.

Q: How would you describe your life during this period between the time of the flood and the time that the house was back together, in terms of your experiences living in the house?

A: Well, it changed. It just—I don't know, it's a hard feeling to describe, unless you go through it. It was just upsetting, Ray would come home and he would become very quiet. He was—I guess we both were. It caused some friction between us because I wanted to just get it done and get over with and things couldn't move as quickly as I wanted them to.

Q: Do you believe that one of your expectations was at that time that our house would flood?

A: Absolutely not, no one else in Sugar Creek, I don't think there has been any since. Sugar Creek was not an area that was prone to flooding.

Q: Describe, if you can, the feeling that you had during that period of time when the house flooded, after it flooded, when the rains would come?

A: I have been trying to forget those. I had just never gone through anything like that before, and you can't really prepare yourself for something like that. I mean, if somebody tells you your house is going to flood out, you say, oh well, I wouldn't necessarily like that, but you can't really—I can't really tell you the feeling unless you have flooded out.

Q: Were you afraid?

A: Afraid, I wasn't afraid, I guess I was—I was just upset that it changed our life style. We were all very happy, and since I lived at home quite—well, most of the time, it meant a lot to me. I'm a very private person, and I really maybe depended upon my house a little more than other people. It was a place

for Ray after work. I think we all feel that way after a day that has been really difficult, you go back to your home and we had a very pleasant home, and we all got along very well, and I guess maybe I relied on that too much.

Although the record is voluminous, the quoted text above is the *only* evidence that can be cited by either party supporting the award of mental anguish. Parkway argues that the evidence cited by the Woodruffs does not demonstrate a high degree of mental pain and distress or a level of emotional harm which rises above "mere worry, anxiety, vexation, embarrassment or anger." *Clawson,* 794 S.W.2d at 43. We agree.

In *Clawson,* the plaintiff testified that she feared for her safety while J.B. Custom Design personnel were in her house; she lost sleep worrying about the repairs; her husband was very upset and angry when he learned of incorrect repairs; the family's life style changed when they moved to a new home because it was in a different school district and had a smaller yard and they had fewer contact with their friends in their former neighborhood. The husband testified that both he and his wife had suffered "a tremendous amount of mental anguish, embarrassment, and distress" over the situation; he had sought medical attention and took medication for stress. This evidence was sufficient to support reversal of a judgment non obstante veredicto setting aside a jury's award of mental anguish damages. There are no objective guidelines by which we can measure the money equivalent of mental pain, and the jury must have discretion in this area. *Green v. Meadows,* 527 S.W.2d 496, 499 (Tex.Civ.App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.); *see also Guilbeau v. Anderson,* 841 S.W.2d 517, 520 (Tex.App.—Houston [14th Dist.] 1992, no writ); *Kold-Serve,* 736 S.W.2d at 756. However, in this particular case, the evidence simply does not demonstrate mental anguish as that term is defined by law. *Phar–Mor, Inc., a/k/a Phar–Mor Discounts v. Chavita,*

853 S.W.2d 710 (Tex.App.—Houston [1st Dist.], 1993, n.w.h.). We sustain Parkway's seventh, eighth, and ninth points of error.

**Attorneys' Fees**

In its tenth and eleventh points of error, Parkway claims the trial court erred in awarding attorneys' fees to the Woodruffs because they were not entitled to recover damages under the DTPA, and the DTPA was the only pleaded basis for recovery of attorneys' fees. Alternatively, Parkway argues the court erred in submitting a jury question that required the jury to state the fees as a percentage of the recovery because that is an improper measure of attorneys' fees to be awarded under TEX.BUS. & COM.CODE ANN. § 17.50(d) (Vernon 1987) of the DTPA as a matter of law.

Our holding that the Woodruffs are entitled to recover under the DTPA is dispositive of the first of these claims. We turn, therefore, to Parkway's claim that a contingent fee based upon a percentage of the plaintiff's recovery is an improper measure of attorneys' fees as a matter of law.

■ While noting the existence of considerable caselaw to the contrary,[14] Parkway argues that the definition of "reasonable attorney's fee" does not include "a speculative or contingent fee based upon the uncertainty of the litigation." Citing *Southland Life Insurance Co. v. Norton,* 5 S.W.2d 767, 768 (Tex.1928). However, *Southland* is distinguishable. There was no evidence of a contingent fee. The holding was that a $5,000 fee was excessive. *Id.* at 769. The case did not hold that a contingent percentage is an improper measure of damages, as here alleged. A contingent fee may be excessive or it may be too low, but Texas courts allow contingent fees as evidence of reasonable attorney fees.

However, as the Woodruffs point out, the Texas Pattern Jury Charge § 110.16 recognizes that a jury issue on the amount of attorneys' fees may be submitted in

---

**14.** *Texas Gen. Indem. Co. v. Speakman,* 736 S.W.2d 874, 885–86 (Tex.App.—Dallas 1987, no writ); *March v. Thiery,* 729 S.W.2d 889, 897 (Tex.App.—Corpus Christi 1987, no writ); *Liberty Mut. Ins. Co. v. Allen,* 669 S.W.2d 750 (Tex. App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.).

terms of a percentage of the plaintiffs' recovery. State Bar of Texas, Texas Pattern Jury Charges PJC § 110.16 (1990). Further, in *Allen v. Allen,* the Fourteenth Court of Appeals expressly approved such a submission. *Allen v. Allen,* 751 S.W.2d 567, 577 (Tex.App.—Houston [14th Dist.] 1988, writ denied). And in *Texas Farmers Insurance Co. v. Hernandez,* 649 S.W.2d 121 (Tex.App.—Amarillo 1983, writ ref'd n.r.e.), where the defendant made an argument similar to Parkway's, the court held that unrebutted testimony that a fee of one-third of the amount recovered is the normal contingent fee and would be reasonable under the facts of the case was sufficient to support an award of that fee. 649 S.W.2d at 124. That court specifically stated that the general attorney's fee statute:

> Article 2226 (now chapter 38, Texas Civil Practice and Remedies Code), is to be "liberally construed to promote its underlying purposes," ... to permit the recovery of reasonable, usual and customary attorney's fees in the circumstances described in the statute. If there is evidence that the reasonable or usual and customary fee is a contingent fee for a particular percentage of the claim or the recovery, that evidence provides an evidentiary foundation upon which the fact finder can calculate the award. To say that such evidence is "no evidence" is to perpetuate a fiction. We hold, therefore, that contingent fee evidence will support an award of attorney's fees ... if the evidence satisfies the tests stated in the statute, is otherwise admissible, and is sufficiently detailed to permit the fact finder to calculate the award. *Accord, Wenk v. City Nat'l Bank,* 613 S.W.2d 345, 352 (Tex.Civ.App.—Tyler 1981, no writ); *Mecey v. Seggern,* 596 S.W.2d 924, 929 (Tex.Civ.App.—Austin 1980, writ ref'd n.r.e.); *Horizon Properties Corp. v. Martinez,* 513 S.W.2d 264, 266 (Tex. Civ.App.—El Paso 1974, writ ref'd n.r.e.).

*Hernandez,* 649 S.W.2d at 125.

 The Woodruffs presented detailed testimony from an expert regarding the nature and purpose of a contingent fee, the appropriate factors for consideration in determining the reasonableness of the fee, and the tasks performed, the hours spent, and the experience necessary to try the Woodruffs' case. The expert stated his opinion that a fee of one-third of the Woodruffs' recovery was "acceptable, customary, and reasonable" and may have been somewhat lower than the fee normally charged because it did not include a factor for an increase in the event of an appeal. Finding this evidence sufficient to support the jury's award of attorney's fees, we overrule points of error 10 and 11.

## Water Code violations

At oral argument, counsel for Parkway stated that the company does not contest the jury's findings on negligence or the judgment of liability entered thereon. (Parkway does contest the measure of damages, however, and that point is addressed later in our opinion.) Because the Water Code violations are supported by the same findings as those supporting the verdict on negligence, they are rendered moot by Parkway's position on negligence, and we will not address them. We overrule Parkway's twelfth point of error.

## The Woodruffs' Cross-point

By way of cross-point, the Woodruffs complain that the trial court erred in refusing to render judgment for them based on the jury's finding that they had incurred out-of-pocket expenses in the amount of $14,000. According to the Woodruffs, the trial judge did not indicate his reasons for denying this recovery. However, they speculate that the judge mistakenly believed the out-of-pocket expenses were also included in the jury's award for the cost of repairs. The Woodruffs contend, however, that these damages do not constitute duplication or double recovery of other damages. Parkway has filed no response to this cross-point.

 In testifying about the incidental expenses he had incurred because of the flooding, Ray Woodruff presented cancelled checks indicating out-of-pocket ex-

penditures for such items as roof leaks,[15] carpet replacement, appliance repair or replacement, air conditioning repair, pest control treatment, and plants. These expenses were not included in the structural repairs that the Woodruffs' expert testified would be needed.

The trial court may properly disregard a jury's finding only when there is no evidence to support the finding or the finding is immaterial. *Burt v. Lochausen,* 151 Tex. 289, 249 S.W.2d 194, 199 (1952); *Winograd v. Clear Lake City Water Auth.,* 811 S.W.2d 147, 154 (Tex.App.—Houston [1st Dist.] 1991, writ denied); Tex.R.Civ.P. 301. Therefore, in denying recovery of these amounts, the trial judge erred. Accordingly, we sustain the Woodruffs' cross-point.

### Parkway's appeal of the judgment in favor of Mickelson

■ In its thirteenth point of error, Parkway claims the trial court erred in granting a directed verdict in favor of Mickelson & Klein, Inc. and Vansickle, Mickelson & Klein, Inc. on Parkway's third-party claims, because there was some evidence that the damage to the Woodruffs' property was caused by Mickelson's negligence or its failure to perform engineering services in a good and workmanlike manner. Mickelson replies that the directed verdict was correct because (1) there was no evidence presented at trial to establish the professional standard for engineers for design of a wall retaining structure in Fort Bend County in 1982–83; (2) there was no evidence of negligence or fault in the preparation and design of the wall retaining structure in question; and (3) there was no evidence that the design of the wall retaining structure was not performed in a good and workmanlike manner by Mickelson. Furthermore, Mickelson states that the preliminary design which it prepared was not implemented when the wall was built.[16]

Mickelson also points out that its only involvement in the project was the preliminary design of a retaining structure for the wall Parkway intended to build at the rear of section 34. The firm was not retained to advise Parkway about whether to build the wall, what kind of wall to build, or where to place it. Therefore, Mickelson argues that the only relevant evidence of professional negligence on its part would be evidence of a breach of the professional standard for the design of a retaining structure for the wall. However, Parkway directs us to no testimony in the record regarding the standard of care for design of a wall retaining structure.

A directed verdict is proper only when the plaintiff fails to present any probative evidence to support its claim, and the winning party is entitled to judgment as a matter of law. *Anderson v. Moore,* 448 S.W.2d 105, 106 (Tex.1969); *Multi–Moto v. ITT Commercial Fin. Corp.,* 806 S.W.2d 560, 566 (Tex.App.—Dallas 1990, writ denied). In reviewing a directed verdict, we view the evidence in the light most favorable to the party against whom the verdict was directed, and we disregard all evidence and inferences in favor of the other party. *Qantel,* 761 S.W.2d at 303. If the record contains any probative evidence that raises an issue of material fact, the judgment must be reversed and the case remanded for trial. *Id.* at 304.

Parkway points to the fact that three engineers who worked for Mickelson & Klein, Inc. had previously worked on the design of section 34 when they were employees of Espey, Huston & Associates, Inc. Parkway infers, therefore, that these engineers knew or should have known that the swale along the back of lots 1, 2, and 3 was necessary to prevent water flowing from the Kaneb tract from going across the Woodruffs' property. In fact, prior to February 1980, Klein wrote a memo specifi-

---

**15.** There was testimony that the roof leaks were the result of excessive movement in the foundation of the house caused by the flooding.

**16.** Parkway contends that there is conflicting evidence on this point and cites a statement by one engineer, Brian Walker, that "To the best of my knowledge, Solution No. 2 [suggested by Mickelson] ... was the one that was actually built." However, Walker also testified that he had no personal knowledge of what was actually done and that he knew for a fact his design was changed "after the fact."

cally referring to the need to keep drainage from the Kaneb tract away from lot 55, and an employee of Mickelson & Klein included the swale in the plans for that purpose. Therefore, Parkway reasons Mickelson knew the purpose and importance of the swale. Nevertheless, its design for the wall retaining structure to be placed behind lots 1, 2, and 3 called for the swale to be filled in and the wall to be placed on top of the former swale.

 Professional negligence in the context of engineering services means doing that which an engineer of ordinary prudence in the exercise of ordinary care would not have done under the same or similar circumstances or failing to do that which an engineer of ordinary prudence in the exercise of ordinary care would have done under the same or similar circumstances. *See Ryan v. Morgan Spear Assoc., Inc.*, 546 S.W.2d 678, 681 (Tex.Civ. App.—Corpus Christi 1977, writ ref'd n.r.e.). This standard of care must be established by the testimony of a qualified expert. *Prellwitz v. Cromwell, Truemper, Levy, Parker and Woodsmale, Inc.*, 802 S.W.2d 316, 317 (Tex.App.—Dallas, 1990, no writ); *see, e.g., I.O.I. Sys., Inc. v. City of Cleveland*, 615 S.W.2d 786, 790 (Tex.Civ. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.). To qualify as an expert able to set the standard of care for a given profession, the witness must be licensed in the same profession. *Prellwitz*, 802 S.W.2d at 317; *see, e.g., Shook v. Herman*, 759 S.W.2d 743, 747 (Tex.App.—Dallas 1988, writ denied); *Tijerina v. Wennermark*, 700 S.W.2d 342, 347 (Tex.App.—San Antonio 1985, no writ).

Parkway cites testimony by Mickelson stating certain general principles of engineering practice: (a) an engineer should consider how his/her work will impact the surrounding geography or the adjacent property where that work is going to be implemented; (b) it would be below the standard of care expected of civil engineers who practice the type of specialty involved here not to have taken into consideration the flow of water off of the Kaneb tract in designing section 34; (c) it would be rea-

sonable for the developer to expect the engineer to take such things as flow of water into consideration in designing a tilt wall such as the one that was designed here and to rely on the engineer in this regard. Parkway's claim thus seems to focus on Mickelson's alleged failure to meet these standards. However, there is considerable evidence in the record that Mickelson considered the surrounding property, took water flow into consideration, and made recommendations to Parkway regarding these factors. Parkway cites us to no evidence showing the opposite.

There was no testimony at trial that Mickelson's design of the retaining structure for the wall did not meet professional standards. In addition, as previously noted, uncontradicted testimony by the Mickelson engineers involved in the project indicated that when the wall was constructed, Mickelson's design was altered and its recommendations were not followed. Finally, there was no testimony by a qualified expert that Mickelson was negligent in any other respect or that Mickelson's engineering work did not meet professional standards in any other regard.

To avoid a directed verdict, Parkway had the burden to establish a prima facie case of professional negligence against Mickelson through competent expert testimony. *Prellwitz*, 802 S.W.2d at 318. Because the record contains no expert testimony of the applicable engineering standard of care on the basis of which a breach of that standard could have been found, and, further, because there was no expert testimony of such a breach, the directed verdict was proper. *Id.* at 319; *see also Stanton v. Westbrook*, 598 S.W.2d 331, 333 (Tex.Civ. App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.); *Smith v. Guthrie*, 557 S.W.2d 163, 165 (Tex.Civ.App.—Fort Worth 1977, writ ref'd n.r.e.). Accordingly, we overrule Parkway's thirteenth point of error.

We reform the trial court's judgment in favor of Ray and Constance Woodruff to delete the award of mental anguish damages and to add recovery of their out-of-pocket expenses in the amount of $14,000.

We affirm the trial court's judgment as so reformed.

We affirm the trial court's judgment directing a verdict in favor of Mickelson.

The judgment is affirmed as reformed.